## KNOX et al. v. MCFARRAN.

1. In an action of ejectment it is competent to show that a conveyance relied upon by one of the parties to the action was made with intent to defraud creditors.

2. To show that a conveyance was made with intent to hinder, delay or defraud creditors the declarations of the grantor, made before or at the time of the conveyance, are admissible, but not his declarations thereafter.

3. One who takes property in payment or security of a pre-existing debt is to be regarded as a purchaser for a valuable consideration.

4. Resulting trusts are not within the Statute of Frauds, and may be shown by parol; the agreement, however, from which the trust springs, must have been a part of the original transaction — a subsequent agreement cannot raise a trust.

*Appeal from District Court of El Paso County.*

EJECTMENT. · The declaration averred seizin in fee ; plea of the general issue. It was stipulated between the parties

at the trial "that the chain of title to the property in con-
troversy from the United States to David M. Rose, is in all
respects legal and perfect."

The plaintiff then gave in evidence a deed of conveyance
from Rose to James Knox, one of the plaintiffs, duly ac-
knowledged and recorded. The deed bore date January 5,
1876, purporting to be from Rose to Knox, trustee, in con-
sideration of $420; conveying the premises in controversy in
fee, and containing the usual covenants of warranty. The
plaintiff then rested.

The defendant offered and read in evidence the deposition
of D. M. Rose, as follows:

"I owned the lot in controversy in 1874–5, and sold it
about January 3d, 1875, I think, to Mr. Wm. Kettlewell, and
gave him a bond for deed — price, $350. The title bond was
assigned to Mr. Sybrandt by Kettlewell, and by Sybrandt to
A. A. McGovney; the latter informed him to that effect
about three months after the title bond became due and
wanted he should call at Mr. McGovney's office and see him
in regard to it; he called at McGovney's office accordingly,
who wanted to make arrangements to pay for lot in lumber;
made arrangements then with him to take $100 in lumber,
the rest he was to pay in cash within one month. The money
was not yet due but Mr. McGovney would pay it before due
by virtue of this arrangement. McGovney was in posses-
sion of this title bond when I went to his office. McGovney
was in possession of the premises a few days previous to
January 1, 1876; I received this title bond from McGovney
about the 5th of January, 1876, and burnt it; the contents
of the bond were, binding myself that if certain notes were
paid that I should make a good, clear title to the lot; 'if
they failed to pay said notes the lot, with all buildings, re-
verted to me, and if I failed to make a deed upon payment
of the purchase-money I forfeited double the amount of the
notes'; I was paid by McGovney for the lot; I made out a
deed to James Knox, trustee, at the request of McGovney;
Knox paid me no consideration for making the deed to him."

On cross-examination — "I do not know that McGovney did not pay for the lot for James Knox."

Defendant offered in evidence a certified copy of the proceedings had in the probate court of El Paso county, December term, 1875, in a suit between James McFarran and A. A. McGovney *et al.*, wherein judgment had been rendered against McGovney for $550 and costs, execution in February, 1876, and levy and sale of the premises in controversy to James McFarran, leaving the sum of $505.80 made on the writ, exclusive of costs. The defendant next gave in evidence an abstract and certificate of record of the judgment bearing date December 22, 1875. Also sheriff's deed to James McFarran, dated February 12, 1877, and recorded June 8, 1877 ; also deposition of A. A. McGovney, who testified that he had at one time a contract for a deed to the premises in dispute, executed by D. M. Rose to William Kettlewell, by him assigned to Peyton & Hunt, by them to Sybrandt and Augustus, and by them to witness. "This contract was in writing and is not now in my possession. I turned it over to James Knox about December 10, 1875. The contract was assigned to me sometime in October, 1875. After I turned the contract over to Knox, I saw it in his possession again about January 5, 1876. Knox at that time delivered the contract to D. M. Rose and took a deed instead. At the time Knox took the deed I may have had the contract temporarily in my possession.

I think I took the contract to Rose and demanded a deed, and Rose executed the deed to James Knox, trustee, and delivered it to him. I assigned the contract to Knox in writing. The best of my recollection the assignment was as follows : 'For and in consideration of one dollar, to me in hand paid, I hereby assign all my title and interest in and to the annexed contract to James Knox, for his use and benefit. Witness my hand and seal, this 10th day of December, 1875.' Knox did not pay the one dollar, mentioned in the assignment, or any other sum, in consideration thereof, at the time the assignment was made. At the time

this contract was assigned to Knox I had paid Rose on it about $140 or $150, leaving a balance unpaid January 1, 1876, when the contract became due, of about $275. This balance due was paid by me about January 5, 1876. I don't think I conveyed, about December 10, 1875, any other real estate to Knox, or any other person. I did not convey any to Knox. I conveyed some to Mr. Capehart, that the firm of McGovney & Co. were interested in. I conveyed about four pieces to Capehart, which property belonged to the firm of A. A. McGovney & Co., but had been deeded to Capehart and myself, individually, for the purpose of protecting the company's interest, as I had become involved in some private matters in which the company was not interested. I did not, during the fall of 1875, or the following winter, convey or transfer any property or interest for the purpose of protecting it against my individual creditors. I turned some property over to my creditors to be held by them as security for what I was owing them. I did not, during that fall and winter, transfer all my interest in my real property to Capehart, and Knox, and others. I retained some of my real estate and all my personal property. I retained all the real estate belonging to me in fee simple, which consisted of a house and lot where I lived, and claimed by me as a homestead. I can't recollect the description of the real estate conveyed to Capehart; it was in Colorado Springs; there were buildings on two of these lots. In January, 1876, I conveyed my interest in a mine, in Lake District, to J. T. Wilson, one of my creditors. Don't know its value. The property conveyed to Capehart was conveyed to him for the purpose of liquidating the company's debts, or holding it for that purpose, and he gave me his note for $3,000 to protect me in case of his death, or against his acts; but when he turned the property over to creditors, or received a credit for it and the company's indebtedness, I canceled his note and returned it to him. At the time the contract was assigned to Knox I was indebted to him as cashier of the First National Bank. I

was not indebted to him individually, but was owing the bank."

*Cross-examination:* "To the best of my knowledge I made the assignment of the contract under seal. I assigned the contract to Knox because I was owing the First National Bank, of which Knox was cashier, and I assigned to him to be held as collateral security for my indebtedness. At the time of this assignment I owed the bank about $4,300; part of it was my own paper and part was paper of parties I had indorsed and who had failed to pay. I was still indebted to the bank at the time the deed was made from Rose to Knox. I had an agreement to receive a credit upon this indebtedness for the property, but don't know whether credit was made or not. I have not examined the paper at the bank to see. I have never received any credit of the bank for only this and one other piece of property that I know of, and that credit was of $2,000. I don't know of my own knowledge that this credit has been made ; it was agreed upon."

*Re-examination* by defendant's counsel.— "This agreement, to give me credit, was made with the First National the latter part of November, 1876. There was no written agreement to show that this assignment was made for the benefit of the bank. I was a director of the First National Bank from October 1st, 1874, to about the 1st of November, 1875. There was an agreement in writing, signed, authorizing Knox to hold the agreement and premises as collateral security for the bank This agreement was made December 10th, 1878, and the paper was delivered to one of the officers of the bank. This agreement was signed by A. A. McGovney & Co. This agreement was attached to the firm note, and I presume is now in the hands of the First National Bank. I cannot state the exact terms of the agreement, only so far that when sold the proceeds were to be applied upon my paper. We had a verbal understanding that the property should not be sacrificed ; that it should be held and carried for our best interests. This verbal understand-

ing and agreement was made about December 10th, 1875. Outside the lot in controversy the bank held as security for my indebtedness a note of $3,500, made by J. V. Sybrandt, and secured by a trust deed on other realty. Some of the property belonged to Capehart and myself at this time, but had never been released from the trust deed; the balance belonged to Sybrandt. Outside of the Sybrandt note, the property of our own turned over to them, part of which was covered by the trust deed, cost us about $1,900. At that time I considered the property worth $3,000. Did not own stock in that bank at the time of the assignment of the contract to Knox."

*Re-examined* by attorney for plaintiff.— "We had a verbal understanding that this property was to be carried for our best interest. I meant that no advantage would be taken of the trust; that they would not force sale of the property, but would carry it a reasonable time so that the most could be made out of it." In answer to the interrogatory, "Were there not other and prior liens existing upon the portion of this property which you say the bank held as collateral security for your indebtedness?" the witness answered: "The Sybrandt trust deed covered three separate tracts of land, upon two of which there was a prior incumbrance of $1,500. "And in answer to interrogatory, "How much more was this property worth than this prior incumbrance of $1,500?" answered: "My judgment was, at the time, December 10th, 1875, it was worth some $1,000, or $1,200; but within two or three months afterward I had occasion to inspect the property and concluded it was not worth any thing more, over and above the incumbrance." In answer to the interrogatory, "As a matter of fact is it not true that property which the bank held as collateral security for your indebtedness, other than this property in controversy, on December 10, 1875, was not worth $3,000, over and above prior liens then existing upon it?" witness said: "It was my impression at the time, if sold at private sale, at a fair

valuation, nearly that sum might have been realized for it, as the improvements on the property cost nearly that, alone, but at forced sale it would not bring half that amount." * * * "There was little if any demand for such property at that time. Subsequent developments have shown that there has been little or no demand for that class of property, and nothing upon which to base a value." In answer to the interrogatory, "Had the note of $3,500, signed by J. V. Sybrandt, any value other than the property in the deed of trust given to secure it?" Answer : "No, sir."

Defendant then offered in evidence the deposition of W. D. Brown, who testified : "I had a conversation with A. A. McGovney in the fore part of December, 1875 ; he told me that McFarran had been suing him on a note of Sybrandt & Augustus, on which he was security ; that he had sued through ugliness and pure cussedness, and that he (McGovney) should not pay it without he was obliged to do so ; if he had to pay, McFarran would be one of the last he should pay of his creditors ; a few days after this McGovney told me he thought he had property enough to pay all his creditors, and more too, if he could realize any thing near what it was worth, and that he should put it in a shape that it could not be sacrificed ; about that time he told me he had made his property over to the First National Bank, or to Mr. Knox, as trustee for the First National Bank ; I think he told me about that time he had deeded some property to Mr. Capehart ; I understood from McGovney, in this last conversation with him, that he had deeded his property to the bank, or to Knox, for his (McGovney's) benefit."

Deposition of A. D. Craigue, offered in evidence by defendant, as follows : "Some time in November, 1875, I called on McGovney and presented my bill to him ; he said he could not pay it then, but would, he thought, before a great while ; he said his creditors were injuring him by pouncing upon him, and he did not intend to be pushed to the wall, or words to that effect, implying, of course, that he intended to make such disposition of his property that

his creditors could not get it at a sacrifice.: this was my understanding from the conversation; he also said that he intended to pay all his debts if his creditors would let him alone."

Deposition of T. J. Wiley, offered in evidence by defendant, as follows: "Mr. McGovney told me they that were pushing him for the money he owed them would not get their money as soon as them that did not push him; that he was going to put his property out of his hands so they could not get it; that he was not going to have his property slaughtered; this conversation was had between the 1st and 5th of December, 1875; I was serving a good many summonses on him which led to the conversation; I was serving a summons on him then in the case of McFarran against McGovney and Sybrandt; within the last three months (date of this deposition, April 25, 1877), I have had a conversation with McGovney concerning the disposition of his property, in which he stated he had given the First National Bank of Colorado Springs his property for safe-keeping, and while he was at Denver they had taken it all away from him and ordered his wife out of the house; if she did not get out they would throw her out; and stated that McIntire, who was president of the bank, had made his brags that he would break him (McGovney)."

Deposition of John Courter, offered in evidence by defendant, as follows: "I heard McGovney make statements concerning the transfer of his property in December, 1875; he stated that McFarran had sued him on the Sybrandt note, and that if McFarran had waited he would have paid it, but now he would not, if he could avoid it; said he would put his property in such shape that McFarran could not get hold of it; that he would not allow his property to be sold under execution for it would not bring half its worth; between Christmas and New Year we met; he asked me what McFarran had to say, meaning in reference to that suit; I told him I had heard McFarran say he (McGovney) had put his property out of his hands for the purpose of de-

frauding him; McGovney's reply was, that he had put his property in a shape to keep McFarran from annoying him; at this time he did not tell me whom he had conveyed his property to."

The defendant here rested.

The plaintiff, James Knox, then testified in his own behalf, in rebuttal, as follows: "I am cashier of the First National Bank of Colorado Springs; A. A. McGovney was indebted to the First National Bank over $4,000, at the time the bond for a deed from Rose was assigned to me and I took this assignment for the benefit of the bank in part payment of McGovney's indebtedness to the bank; at the time of this assignment I was cashier of the bank; I had no knowledge of McGovney's indebtedness to McFarran at the time this bond for a deed was assigned to me, and did not hear of such indebtedness for some time after the deed was made from Rose to me; I had no intention of defrauding any person in taking this assignment of the title bond from McGovney, and in taking the deed from Rose; but had the bond assigned and the deed executed to me to secure the bank so far as I could for what McGovney owed it; McGovney still owes the bank over $2,000 of the money due it at the time of this assignment of this bond for a deed.' The plaintiff's counsel asked the witness this question, viz.: "What was the consideration, if any, passed between you and McGovney for the assignment of the said bond for a deed to the premises in question by McGovney to you?" "The consideration of said assignment was the credit to be given McGovney upon his indebtedness to the bank." The defendant's counsel then moved to strike out this answer, which motion was sustained by the court and the court thereupon instructed the jury not to consider this answer in making their verdict, and plaintiff excepted.

George H. Stewart then testified on behalf of the plaintiff: "I was in December, 1875, and January, 1876, president of the First National Bank of Colorado Springs, and know that A. A. McGovney was at that time indebted

to the bank over $4,000 ; I knew of this bond for a deed given by Rose, and held by McGovney, and assigned to the plaintiff, Knox; knew that McGovney was to assign this bond for security of what he owed the bank ; I did not know at that time that McGovney owed McFarran any thing ; previous to December 10, 1875, the officers of the bank had been urging McGovney to come in and settle up his indebtedness due the bank."

The jury rendered a verdict of not guilty, and a motion for a new trial having been interposed and overruled, judgment was rendered on the verdict. To set aside this judgment the plaintiffs appealed to this court

Messrs. WILLIAMS & McMORRIS, for appellant.

Mr. J. C. HELM, and Mr. WM. HARRISON, for appellee.

ELBERT, J.   The superior facilities of a court of equity to investigate questions of fraud, its greater power to afford relief, the propriety of investigating questions touching the validity of conveyances of real estate in a direct rather than a collateral proceeding, would have made a resort to its jurisdiction in this case advisable.   Courts of law, however, have generally insisted upon a broad concurrent jurisdiction in matters of fraud, and we accept the decisions as we find them.   In an action of ejectment it is competent to show that a conveyance relied upon by one of the parties to the action was made with intent to defraud creditors. *Jackson, ex dem., etc.* v. *Myers,* 11 Wend. 535 ; *Jackson, ex dem., etc.* v. *Burgett,* 10 Johns. 456 ; *Remmington* v. *Linthicum,* 14 Pet. 361 ; *Rogers* v. *Brush,* 5 Gilm. 580 ; *Jameson* v. *Beaubien,* 3 Scam. 114 ; *Baze* v. *Asper,* 6 Minn. 220 ; *Crook* v. *Swan,* 5 Conn. 140 ; *Marcy* v. *Kinney,* 9 id. 397 ; *Lillie* v. *Wilson,* 2 Root, 517.

That a like question of fraud might be investigated in an action of forcible detainer was held in the case of *Wilcoxen* v. *Morgan,* 2 Col. 473.   There is no reason for prescribing a different rule in ejectment.   If the assignment by McGov-

ney to Knox, of his bond from Rose was with intent to hinder, delay or defraud his creditors, it is immaterial that Rose, the grantor in the subsequent deed to Knox, did not participate in the fraudulent intent. That the deed was made to Knox instead of McGovney would be in pursuance and the result of the fraudulent assignment, and the deed must stand or fall with the assignment. If the taint of fraud attached to one, it attached to the other. The ends of the law cannot be defeated by indirection. To show that a conveyance was made with intent to hinder, delay or defraud creditors, the declarations of the grantor made before, and at the time of the conveyance are admissible, but not his declarations thereafter. *Wilcoxen* v. *Morgan*, 2 Col., *supra;* *Wheeler* v. *McCarristan*, 24 Ill. 40; *Randeger* v. *Ehrhardt* 51 Ill. 101; *Simpkins* v. *Rogers*, 15 Ill. 397; *Frear* v. *Evertson*, 20 Johns. 142.

The court erred in admitting the declarations of McGovney, touching the assignment of the bond after the date of the assignment. In view of a re-trial we notice a few of the other questions made.

If the assignment was fraudulent and void, it was immaterial that Knox did not participate in the fraudulent intent, if he paid nothing. He must have been a purchaser for a valuable consideration and without notice of the fraud. § 20, R. S., p. 340; *Wilcoxen* v. *Morgan*, 2 Col. 478. The evidence shows that Knox paid nothing, but claimed to hold the property in trust. If the assignment of his title bond by McGovney to Knox on the 10th of December was for the purpose of securing an existing indebtedness to the First National Bank of Colorado Springs, there was a good and sufficient consideration to support the assignment. Although there is a conflict of authority on the question, we regard it as the better doctrine, that one who takes property in payment or security of a pre-existing debt, is to be regarded as a purchaser for a valuable consideration. 1 Hilliard on Mortgages, 610; Herman on Mortgages, § 52; *Babcock* v. *Jordan*, 24 Ind. 14, and cases there cited.

The assignment and deed to Knox are, on the face, absolute, and objection is made that under the statute a parol trust cannot be shown. § 18, R. S., p. 340. It is a familiar doctrine that resulting trusts are not within the statute, and may be shown by parol. 2 Wash. R. P. 472 *et seq.* The agreement, however, from which the trust springs must have been a part of the original transaction ; a subsequent agreement cannot raise a trust. Id. If the assignment and deed in this case, to Knox, were in consideration of a credit to be given by the bank to McGovney, on an existing indebtedness, or in security for the payment of an existing indebtedness to the bank, there was a resulting trust that, as between the bank and Knox, it was competent to show by parol. 2 Wash. R. P., *supra.*

In this case there is no dispute about the trust as between the beneficiary and grantee. The bank and Knox both agree that the assignment was in trust to secure McGovney's indebtedness to the bank. The object of the parol evidence was not, therefore, to charge the grantee, but as between the grantee and the creditor, the plaintiff, and defendant in this suit, to show a valuable consideration. To show this, parol evidence is admissible. 4 Kent's Com. 465*, and cases cited. There can be no greater objection to the admission of parol evidence for this purpose than to its admission, in the first instance, to set aside the conveyance for fraud. At the date of the assignment the defendant had no lien upon the premises. If Knox was a *bona fide* purchaser for a valuable consideration, notwithstanding the fraudulent intent, McGovney's equitable interest passed by the assignment, and the defendant took nothing by his levy and sale under his execution.

The judgment of the court below is reversed and the cause remanded for further proceedings.

*Reversed.*