Bissell, J.,
delivered the opinion of the court.
Which equity must prevail in a suit between a bona fide transferee for value of a bill of lading and a vendor of goods who attempts to exercise the right of stoppage in transitu has never been doubted since their legal status was defined in the leading case of Lickbarrow v. Mason (4 Bro. P. C. 57, 2 T. R. 63), decided in the House of Lords in 1793.
In such cases the principal things to be inquired about are *217 the circumstances of the transfer and the means employed by the vendor in his attempts to stop the goods.
For some five or six jrnars prior to the spring of 1892, Boehm & Co. had been large wholesale rectifiers and dealers in spirits. They did business with The First National Bank of Denver. In the course of their dealings they were frequently large borrowers of mone}r, and procured extensive accommodations from the bank by way of advances on drafts drawn by them on their customers, loans on their own and their customer’s commercial paper and overdrafts, which accrued in the general course of business. The firm had a substantial and large credit with the bank, and the account varied from the ordinary credit maintained by such a house to an indebtedness of $150,000. The debt was cared for in various ways; — sometimes by payments in cash and sometimes by the deposit of other forms of commercial credit. During the later part of the dealings between the bank and the house, Boehm & Co. were accustomed to protect their liabilities by daily deposits of warehouse receipts and bills of lading, which covered goods in stock and in transit. On the 10th of March, 1892, Boehm & Co. were indebted in a very large sum, amounting, speaking generally, to upwards of $100,000. The firm required more money on that day, and applied to the bank for a loan of $15,000, which the bank declined to make without some engagement on the part of the company to protect or “ cover ” the loan, as the English bankers have it. It is very clear the firm agreed on that day to protect this- loan by the deposit of sundry warehouse receipts and bills of lading, if' the bank would advance the money. Ther.e is no very clear testimony as to what receipts or what bills of lading were to be delivered to the bank. The cashier gave evidence that Mr. Boehm mentioned, as .part of the securities which he was to deposit, a bill of lading for some goods which were coming from New Orleans. It is not plain whether the class or description or amount of this particular shipment was stated. On the testimony, it seems to be a general statement or promise by Boehm to *218 deliver a bill of lading of some goods which were about to be shipped from New Orleans. It transpired that some time in February Boehm & Co. had made an order on the appellees, Schmidt & Ziegler, for a lot of wine. On the 4th of March the firm received a letter from the New Orleans house ac-knowledging the receipt of the order and promising to ship it at once, and, in the natural course of events, the bill of lading for the goods was due on the 10th of March. Acting on the strength of this engagement bj- Boehm & Co. the bank, between Monday and Saturday, advanced upwards of $15,000. The last of the funds was paid on Boehm’s account on Saturday, the 12th. The bill of lading arrived, according to the testimony, on Saturday, the 12th of March, and was delivered to the bank. This statement is made on the strength of the •evidence, disregarding all speculation as to the probabilities of the arrival of the goods from New Orleans, or as to the day on which the bill of lading was- mailed from that city. The cashier of the bank testified that, according to his best recollection, the bill of lading was given to him on Saturday. The surviving member of the firm, N. Steenboek, also testified to the same point. This is the only direct evidence as to the time when the bill of lading arrived and was delivered. A number of depositions were taken in New Orleans, and an attempt was made to show the riiailing of the bill on the 10th, whereby an inference could be drawn that it would have been, impossible for the bill to have arrived before Sunday. The testimony in New Orleans was given either by employees of the railroad company, or clerks of the vendors, whose duties were to attend to the shipment of the goods, the transmission of the accounts and bills, and the issuance of the bills .of lading by the railroad company to the vendors. None of them had any specific recollection concerning the matter. On the strength, however, of their general custom respecting such transactions,-the witnesses testified generally that while they had no specific memory about this particular matter, the bill, though dated the 9th, was probably not procured until the 10th, nor mailed until that day. This evidence of *219 the general and prevailing custom in such matters cannot be allowed to overcome the definite recollection of the two living witnesses who received the instrument.
The finding of the court respecting this matter is not very plain, though in his opinion he- intimates the delivery to have been on Sunday. We do not depart from our custom to yield our own judgment on any matter of fact to the finding of the nisi prius court, because in this particular, the case is not at all dependent on the court’s conclusion. As we view it, it would make very little legal difference whether the bill was delivered on Saturday or Sunday. We are, however, so clearly of the opinion that the case as made justifies no other conclusion, that we state out judgment about this matter of delivery. On the evidence, it is very satisfactorily shown that the bill passed into the hands of the bank on Saturday. We attach no importance whatever to the hour of its delivery, whether before or after the bank was generally closed to the public. We- are bound to know the course of dealings-between banks and their customers. Everybody understands that it is a very common occurrence for a customer to arrange for a loan and receive a credit in the bank on which lie can check on his promise to- cover or protect the credit by a subsequent delivery of some kind of security. The agreement is frequently carried out in respect to the delivery óf the securities after the bank has technically closed. The bank cannot be said to- lose its rights acquired by a transaction with its customer had after its doors are technically shut to the general public for the- purposes of deposit and check. The bill of lading of these goods was endorsed by Boehm & Co. and delivered to the bank in performance of the agreement made on the-10th. of March, when the greater part of the $15,000 was paid over to the firm. The subsequent delivery of the bill' on- Saturday was in fulfillment of the agreement made by Boehm at the time- the bank did its part in the payment of the money. On Sunday, the 13th, the bank became suspicious of the solvency of Boehm & Co., and took steps for the protection of their interests. A statement *220 between tbe bank and the house was made up, attorneys were consulted, and, on the morning of the 14th, an attachment was levied on whatever assets the firm had. Aside from this single circumstance, there is nothing in the record which tends to show any knowledge on the part of the bank’s officers of the insolvency of Boehm & Co. Whatever testimony was given tended to establish a belief on the part of the bank that Boehm & Co. were solvent. As we all know, it frequently happens that a bank has its suspicions aroused concerning a customer’s solvency long before it acquires any actual knowledge about it, and long before there is any question respecting it in the mind of the general mercantile public. Nothing is more sensitive to the financial atmospheric condition than a customer’s credit in a bank. To protect themselves and their depositor’s money which is loaned to the merchant, banks are always watchful and wary, and, on the slightest fall of the financial barometer, are swift to protect their money. The examination of the cashier was not very vigorously pursued to establish knowledge of Boehm & Co.’s insolvency. We have no right to indulge in inferences about it, because the direct testimony is to the contrary. Whatever the witnesses said was directly to the point of a lack of knowledge or conviction on the part of the bank’s officers that the firm was insolvent. We must therefore assume the bank took the bill in good faith, and advanced money on the strength of its endorsement and delivery, and, undej1 the evidence, were Iona fide holders for value. The goods left New Orleans on the 11th of March, and were stopped on directions given to the carrier oh either the 14th or the 15th of the same month. Thereupon the bank brought suit to recover the goods. Schmidt & Ziegler defended, and, under an arrangement between counsel, the fund was held to await the result of the litigation. The consignors defended the action, and a trial was had between them and the bank, which resulted in a judgment for Schmidt & Ziegler, from which the bank appealed.
This judgment is not supported by the proof. The equi *221 ties of the bank which sprung from their advancement to Boehm & Co. on the faith of the endorsement'of the bill of lading must prevail over the legal j’iglit .which always accrues to a vendor of goods to stop them in transit when he is informed of the insolvency of the vendee. The case presents but a single fact about which there is any diversity in the cases. As we view the testimony, even this matter is eliminated from the case. The appellees place great reliance on what they contend were the circumstances of the transfer. The fact of the advance on the strength of -the endorsement of the bill is urgently disputed on the theory of a lack of connection between the loan and the endorsement of the instrument. Many cases are cited on the proposition that if the transfer be made as a security for an antecedent debt, the holder shall not be taken to have received it for value and to be entitled to the protection which comes to one who occupies that relation to the security. If this were the law in Colorado, we might be compelled to support our position by demonstrating the accuracy of our statement, that the loan was in fact made on the basis of the endorsement of the security. There is small necessity for this discussion, since it has long been settled in Colorado that an antecedent debt is a good consideration, whether in the actual purchase of property or an acceptance of it as security for the payment of the antecedent debt. Knox et al. v. McFarran, 4 Colo. 586; McMurtrie v. Riddell, 9 Colo. 497; Merchant's Bank v. McClelland, 9 Colo. 608; Haraszthy v. Shandel, 1 Colo. App. 137.
In this state, then, there need be no concurrence between the advancement of the money and the delivery of the security. Whatever may be the fact respecting the particular advance of $15,000, and the endorsement of the bill, the legal status of the bank would be unchanged. It would be a holder for value whichever way the fact might be found. We do not concede the appellee’s contention izi regard to this fact. There is no evidence whatever respecting the tz-ansaction, save what was given by the cashier. His direct evidence was to the point that the bank loaned $15,000 on its *222 faith in the promise which Boehm made to deliver to it securities to cover the credit. The evidence even goes farther than this, and shows the promise was made to deliver this' particular security, since no other goods were expected from New Orleans save'those which had then been shipped by the appellees. The case is thus brought directly within the purview of Leack v. Scott Bros., 2 Law Rep. (Q. B. Div.) 376.
It was there adjudged that a holder of a bill of lading received subsequent to an advance, which was made on the strength of a promise by the transferor to cover his account, made the banker a holder for value. The cases generally concede that an advance made on the strength of a promise to deliver a particular security will make the banker a holder for value. According to this case, a general promise to cover, followed by performance, will be equally effectual. We conclude the facts in this case show not only a general promise to cover the credit, followed by either a total or partial performance, but a specific promise to cover by the delivery of this particular bill. In any event, the bank brought itself strictly within the legal definition of a holder for value.
The only other consideration, which, under the record, is of veiy slight consequence, respects the good faith of the bank in accepting the security. Knowledge of the endorsers’ insolvency is seldom a matter of presumption. The extent of the indebtedness to the bank, the call for collaterals, which was heeded, followed shortly and sharply by an attachment to collect the debt, does not necessarily compel us to infer that Boehm & Co. were insolvent, or that the bank had knowledge of their financial condition. Whatever significance might be given to this proof, in the absence of direct testimony on the subject, we are not at liberty to indulge in speculations and permit our inferences to overcome the direct testimony in the case. Direct evidence was given about the bank’s knowledge of this fact, and it was established that the bank was without knowledge either of the insolvency of the firm or of such facts respecting its financial condition as would legally charge them with knowledge about it. In *223 fact, the proof is that the money was loaned on the 10th, and the attachment proceedings were not begun until the following Monday, nor steps taken in that direction until Sunday, the 13th.. What changes may have occurred which influenced', the bank we do not know. ■ We can simply take the' record as we find it. We do not intend to be understood as declaring the matter to be settled by the present record, nor are we able to anticipate what the subsequent trial, if one is had, may show; all we decide is the bank must be held on the present case to have had no knowledge of the insolvency of Boehm & Co., and they are therefore left to enjoy the rights and to reap the fruits of the equities which flow from the receipt in good faith for a valuable consideration of a properly endorsed bill of lading. These are well defined, clear and unquestioned. Porter’s Law on Bills of Lading, chap. 37; Daniel on Negotiable Instruments, (4 ed.) vol. 2, sec. 1730 et seq.; Becker v. Hallgarten, 86 N. Y. 167; Forbes et al. v. Boston & Lowell R. R. Co., 133 Mass. 154.
On the oral argument and by a subsequent brief, the appellees seek to question the authority of the bank to maintain the suit for lack of either allegation or proof of their incorporation. The question does not appear to be one of any gravity or importance, nor do we incline to the opinion that the appellees may question the right of the bank to contract as it did with Boehm & Co. about this bill of lading. The legality of their act seems to be a question only between the original parties to it, or the government from which the bank derives its authority. National Bank v. Whitney, 103 U. S. 99 ; Gold Mining Co. v. National Bank, 96 U. S. 640.
In one of the defenses the appellees alleged a lack of authority on the part of the bank to make the loan, and aver it was a national bank organized and incorporated under the national bank act, which after judgment would certainly.be treated as a sufficient admission to entitle the bank to maintain its suit when the only question was whether, by allegation and proof the bank’s corporate capacity had been established. The complaint was probably defective in this partic *224 ular, but this will not compel us to affirm the judgment, and it is a matter very easily corrected by amendment when the case returns for a new trial.
Some other matters have been brought to our attention, but it does not seem necessary to determine them or assign; the reasons for our judgment about' them. For the errors already discussed and resolved in favor of the appellant, the judgment must be reversed and remanded for a new trial.

Reversed.