### ELDER, APPELLANT, v. SCHUMACHER, APPELLEE.

1. DEED OF INSANE PERSON, PRACTICE.
It is competent to show the incapacity of the grantor of a deed relied upon as a defense to an action of ejectment.

2. EQUITY.
The grantee named in the deed of an insane person who was cognizant of the mental condition of the grantor at the time it was executed is not in a position to require the consideration to be refunded as a condition to the setting aside of the deed.

3. RECITALS, WHEN NOT EVIDENCE.
A grantee who purchased with notice of a prior equity cannot rely upon

the recitals of the deed to show that he gave a valuable considera-
tion for the same.

4. INSTRUCTIONS.

Instructions are to be read and considered in the light of the pleadings
and evidence in the case.

*Appeal from the District Court of Lake County.*

THIS is a controversy in reference to the title to lots num-
bers twenty-seven and twenty-eight, in block sixty-six, Ste-
vens & Leiter's subdivision of U. S. Survey No. 271, in the
city of Leadville, county of Lake, and state of Colorado.
. The complaint is in the form usually adopted under the.
code for possession and damages for the detention of real
property. It is alleged therein that Charles P. Schumacher,
the plaintiff, is the owner of the property in controversy.
The defendant Dixon made default. He was merely a ten-
ant and had no interest in this controversy. The answer
of appellant, George W. Elder, denies the ownership of appel-
lee, and claims title in fee in himself. Afterwards appellee
filed a replication, setting up the insolvency of F. W. De-
Walt, one of appellant's former grantors, on the fifth day
of September, A. D. 1882, when said F. W. DeWalt deeded
the property in controversy to his wife, L. M. DeWalt, and,
as a further reply, appellee alleges that the deed executed
by Mrs. L. M. DeWalt on January 4, 1883, to Mrs. Ellen
K. Brewster, of said property, was not and is not the deed of
the said L. M. DeWalt; that at the time of the execution of
said deed Mrs. L. M. DeWalt was mentally wholly incapable
of, and incapacitated from executing or understanding any
deed or contract; that she was wholly unconscious, and un-
able to know or understand anything that was transpiring
about her; that said deed, if ever it existed, was a forgery.
Upon the trial the following facts were admitted:

First, the title to the property in F. W. DeWalt, on Sep-
tember 5, 1882, and that on that date F. W. DeWalt deed-
ed the property to his wife, Mrs. L. M. DeWalt. On January
4, 1883, Mrs. L. M. DeWalt by warranty deed conveyed the

property to Mrs. Ellen K. Brewster, her sister. This deed was acknowledged before a notary public and recorded. It recites a consideration of $2,500. On the eighteenth day of April, A. D. 1884, Mrs. Ellen K. Brewster deeded the property to her sister, Mrs. Annie McNaney, by warranty deed. This deed was duly acknowledged and recorded. On the sixth day of September, A. D. 1886, Mrs. Annie McNaney, and B. McNaney, her husband, by quitclaim deed conveyed to George W. Elder, appellant herein, the said property. This deed was also duly executed and acknowledged.

Appellee in support of his claim of title to the property offered in evidence a record of the judgment in the case of *J. Sam Browne, Receiver, v. F. W. De Walt.* Judgment was entered in the district court of Lake county in favor of plaintiff for $42,455.68. Following the admission of this judgment, plaintiff offered in evidence the execution issued thereon, together with the return of the sheriff, showing a levy upon the property in controversy, and other property. This levy was followed by sale and deed of the property by the sheriff to J. Sam Browne, receiver.

Quitclaim deed from J. Sam Browne, receiver, to Clinton Reed, dated the 20th day of November, A. D. 1886.

Also deed from Clinton Reed to Charles P. Schumacher, for said property, dated August 8, A. D. 1888.

Mrs. DeWalt was stricken with paralysis on January 2, A. D. 1883, and on the 24th of the same month died, without issue. The remaining facts sufficiently appear in the opinion.

Messrs. BELFORD & WIKOFF, for appellant.

Mr. CLINTON REED and Mr. J. A. EWING, for appellee.

CHIEF JUSTICE HAYT delivered the opinion of the court.

The sole controversy in this case grows out of the deed of Mrs. DeWalt to her sister, Mrs. Brewster. The contention

of the plaintiff is that Mrs. DeWalt at the time of its execution was *non compos mentis*; it is claimed that no title passes by this deed, but that the title to the premises remained in Mrs. DeWalt, notwithstanding the deed, at the time of her death, and that, dying without issue, the title vested in her husband, under the statute, thereby becoming subject to execution for his debts. No question was raised by counsel below, or in this court, as to the sufficiency of the pleadings to raise the question of Mrs. DeWalt's capacity at the time to execute the deed to Mrs. Brewster. And no evidence was introduced showing, or tending to show, that Mr. De-Walt was insolvent at the time he deeded the property to Mrs. DeWalt.

In support of plaintiff's contention that Mrs. De Walt was of unsound mind at the time she deeded the property to her sister, Mrs. Brewster, the following evidence, *inter alia*, was offered and admitted:

B. S. Galloway, a witness called on behalf of plaintiff, testified, *inter alia*, that he was a practicing physician and attended Mrs. DeWalt in her last illness; was called to her within a few minutes after she was stricken with paralysis, upon the second day of January, A. D. 1883. The witness continuing said: " I was called there within fifteen minutes after she was stricken down, and found her in an unconscious condition, apparently suffering a good deal of pain, and entirely paralyzed. I think it was on the left side. She died on the twenty-fourth day of the same month, from that trouble. . . . She did not have her reasoning faculties during that time. There were times when she would apparently understand some things that were said to her, but the greater part of it she knew nothing that was going on about her. She was not of sound mind, I should judge, not any of the time I attended her up until her death." On cross-examination the witness said that he was called to attend Mrs. De Walt on the second of January, in the evening, between six and seven o'clock; that he found, at her bedside, Mrs. Tomkins, one of her sisters, Mr. DeWalt, Mr. Tomkins and Mrs.

Brewster. * * * The witness further testified that during her sickness there were times that she would apparently understand what was said to her. * * * "I was not there all the time, and was very glad not to be. . There might have been a great many times that she understood what was said to her, in my absence."

Upon redirect examination, the witness said: "She had no feeling on the side that was paralyzed; I would occasionally pinch the limbs to see if there was any sensation left. I believe they were burned at one time, and hot applications applied to her, and it was so hot that it would burn her, and she did not know anything about it."

Dr. D. H. Dougan testifies that he was called to attend Mrs. DeWalt on the second day of January, A. D. 1883, in consultation with Dr. Galloway; that he was there within, probably, half an hour of the time of her attack; that he saw her every day for the second, third, fourth, fifth and sixth days, and after that at irregular intervals until her death. * * * " On my arrival I found her suffering from apoplexy; she was totally unconscious; paralyzed on one side, and the condition was one that suggested danger of death within a few hours. She remained paralyzed until her death, on one side, and her mental condition, my recollection is, cleared up to some extent during her illness; that is to say, at first she was absolutely unable to express any wish, or want, or to respond to any question, but there were days during her illness when she would answer 'yes' if you asked her if she wanted water, and show some degree of intelligence." The witness further testified that according to the best of his judgment there was no time during her illness when she was of sound mind. " I should say she had the most intelligence about the middle period of her illness." He also testified, in answer to further inquiry, that he did not think that at any time during her sickness her mind was in such condition that she had sufficient mental capacity to make a contract.

Louise S. Call, a witness for the plaintiff, testified as follows: " I knew Mrs. DeWalt in her lifetime; was her

nurse during her last illness; was with her constantly: I should think that she was in a semi-conscious condition. I don't think she realized or knew anything. She realized nothing; she knew no one perfectly. When I first went into her room she was very averse—she did not like to have any strangers come in; it made her very nervous and hysterical if they did, and they hesitated about having me come in; but as soon as I went in she thought I was an old schoolmate friend of hers, Ella Bickford, and she called me ' Ella ' all the time I was there, and became very much attached to me, and wanted me to stay with her all the time, and would hardly let me go upstairs to get a little rest. I had to lay down by the side of her, and she imagined her sickness was caused from a different cause altogether; she thought there was a child and that it had been taken away from her, and she craved constantly for the baby. They never had any children. I know that she was never able to give herself a drink of water; she could not raise her hand to her head. I am very positive it was the right side that was paralyzed, because I know she was perfecly helpless. She was not in a condition to sign her name, or to realize what anyone was saying, if they should have made a request of that kind; she could not do it possibly. * * * She never connected any sentences, very seldom ever. Mrs. Brewster was with her, and Mrs. Tomkins, all the time."

On cross-examination this witness said:

"I cannot really remember the date when I went there, exactly, but she had not been sick but a very few days, four or five days, when I went there."

The only other witness called to testify as to the mental condition of Mrs. DeWalt during her sickness was H. H. Tomkins. This witness testified among other things, as follows: "I have known Mrs. DeWalt all my life, nearly. I did not visit very much at the house during her illness. I was there probably—well, immediately preceding her death I was there every day. I called at the house several times, but I did not see Mrs. DeWalt but twice, I think. The

first time, I think—was they told me she was getting better, I could go in and see her; it was about ten days or two weeks, I should judge, after she was taken sick, or had this stroke, I saw her; she was in bed. * * * She recognized me; I had a conversation with her; she comprehended what I said, and I comprehended what she said. I could not say how many days that was before she died. I think she died, if I recollect right, about a week afterwards."

The foregoing is the substance of all the testimony offered with reference to the mental condition of Mrs. DeWalt, during her last sickness, except that her attending physician testified that the usual rule in such cases was for the patient to be at her best about the middle of the sickness, and, while he had no distinct recollection of this particular case, he judged that Mrs. DeWalt's case was not an exception.

There is abundant evidence to warrant the jury in finding that Mrs. DeWalt was physically incapable of signing her name on the fourth day of January, the date at which the deed to Mrs. Brewster purports to have been executed; and also to show that she was mentally incapacitated from transacting any business intelligently after she was stricken with paralysis, on the second day of January.

It also appears that Mrs. Brewster, the grantee in the deed, was present during her entire sickness, and was fully informed of such physical and mental incapacity.

In addition to this, it is shown that George B. Elder, who was the real purchaser of the title derived through the deed of Mrs. DeWalt, taking the deed in the name of his father, George W. Elder, the appellant, knew at the time of the outstanding title claimed under the execution sale. In fact he was negotiating to purchase the latter title, prior to the actual purchase of the former.

In the light of the foregoing evidence, we will consider the two legal questions which appellant says arise in this case, and which he deems of more than ordinary importance. These questions as stated by counsel are,—

First: How far does the condition of a remote grantor af-

fect the rights of a remote grantee, who purchased in good faith without notice of any unsoundness, and who is guilty of no fraud?

Second: Is a *bona fide* grantee entitled to have the money paid by him restored, before the deed under which he claims can be set aside?

As we have said, the jury were warranted in finding that appellant had notice of the alleged defect in the title that he was receiving, at the time he purchased. Aside from this, the jury were warranted in finding (and in support of the judgment of the court below we must assume that they did find) that Mrs. DeWalt at the time the alleged deed was made by her, to her sister, was physically and mentally incapable of executing a conveyance. Under these circumstances, the deed in question was absolutely void, and of no force and effect whatever.

In *Knox et. al. v. McFarran*, 4 Colo. 586, it was decided that in an action of ejectment it is competent to show that a deed relied upon to defeat the action was in fact made with intent to defraud creditors. The opinion proceeds upon the well established jurisdiction of courts of law to investigate matters of fraud. In this case it is claimed that the deed in question is a forgery, and the court certainly had jurisdiction to determine that question. Moreover, the question of the capacity of the grantor to convey and the cognate question of forgery were fully raised by the pleadings in the case. Appellant deraigned his title in his answer, and the replication set up the incapacity of Mrs. DeWalt, appellant's remote grantor, and the question of such incapacity was clearly open to investigation. In fact, this was the sole issue tried in the district court. Parties ought not to be allowed to question, in this court, a proceeding to which they assented at the trial.

Aside from this it has been held in many well considered cases that it is competent to show the incapacity of the grantor of a deed, relied upon as a defense to an action of ejectment. *Dexter v. Hall*, 15 Wall. 9 ; *Eaton v. Eaton*, 37 N. J. L. 108 ; *Farley v. Parker*, 6 Oregon, 105, and cases cited.

The invalidity of Mrs. DeWalt's deed to Mrs. Brewster appearing, and this deed being an essential link in appellant's title, it follows that his title must also fail.

Preliminary to the consideration of the second question, we are led to inquire whether appellant paid any consideration for the deed which he received. Mrs. Brewster being cognizant of the mental condition of Mrs. DeWalt, at the time it is claimed the deed to her was executed, is not in a position to demand repayment, even if she had given a valuable consideration for such deed, which is not shown. While there is some conflict in the authorities as to the circumstances under which courts will require the consideration to be refunded as a condition to the setting aside of the deed of a *non compos mentis*, all agree that a person, paying with knowledge of the incapacity of the grantor, cannot recover. And Elder, having purchased with notice of the prior equity, cannot rely upon the recitals of his deed to show that he gave a valuable consideration for the same. There is consequently absolutely no evidence in the record that he ever paid a dollar for the quitclaim under which he claims title.

The instructions, when read in the light of the pleadings and evidence in the case, we think will be found to satisfy the law. Instruction No. 5 reads as follows :

" The court instructs the jury, that if you believe from the evidence herein that L. M. DeWalt, on the fourth day of January, 1883, had no sufficient strength of mind and reason to understand the nature and consequence of her act in making a deed, then she did not have the power to convey an indefeasible title, and this incapacity inheres in all titles derived from her; the grantee whose title is thus derived must rely on the covenants of his deed. He risks the capacity to convey of all persons through whom his title has passed; the right of such a person to avoid his or her contract is an absolute and paramount right superior to the equities of other persons, and may be exercised against *bona fide* purchasers, from the grantee, and the law does not require the party

claiming the premises as against such purchaser to repay, or to offer to repay, the amount paid by him for said premises."

It is claimed that it would have been more accurate if, instead of specifying the date as January 4th, the instruction had said at the time of executing the deed to Mrs. Brewster. We do not think the instruction is open to this criticism. There is no evidence to show that Mrs. DeWalt's physical and mental capacity varied materially during any portion of the time mentioned. The evidence, on the contrary, shows that she was physically and mentally incapacitated from executing the deed at any time during her sickness. If the evidence had shown that her incapacity was temporary, varying from day to day and hour to hour, then it might have been necessary for the court to have given the instruction in a different form.

It is said that the part of the instruction referring to the " power to convey an indefeasible title " is erroneous. Perhaps the court would have been justified under the circumstances in instructing the jury that the conveyance made under such circumstances was absolutely void, but the giving of the instruction in the more modified form, if error at all, was error in favor of the appellant, of which he had no right to complain.

The terms void and voidable, with reference to instruments executed by persons of unsound mind, are sometimes used by law writers indiscriminately. An examination of the authorities discloses that in a case where a deed *ab non compote* has not been ratified after restoration of the mental faculties, it is generally designated as void, while a deed executed under similar circumstances, if afterwards ratified, is usually spoken of as voidable.

This case appears to have been fairly submitted to the jury, and the evidence is overwhelmingly in favor of the finding for appellee. The judgment should be affirmed.

*Affirmed.*

GODDARD, J.   This case was tried before me at *nisi prius*,

and I should decline to take part in its decision were it not imperative that I do so.

The constitution makes it necessary that a majority of the judges pronounce a decision. My associates are unable to agree upon the important questions involved, and this necessitates my taking part in their determination.

Upon a thorough examination of the adjudged cases, I am fully satisfied that the conclusions announced by the chief justice are sustained by reason and authority. I therefore concur in affirming the judgment.

MR. JUSTICE ELLIOTT (dissenting):

I cannot agree with the majority opinion as expressed upon this rehearing. It seems to me my associates have fallen into the error of considering this a trial court for the purpose of determining the issue upon the evidence, instead of keeping within the province of an appellate court reviewing an action *triable, and actually tried, by jury upon oral evidence.* Moreover, I fear the majority opinion will tend to inaugurate a practice permitting land titles to be attacked and overthrown without affording adequate means of defense or redress in many cases. I shall endeavor to show that by a different mode of procedure the truth may be more certainly ascertained, and right and justice more equitably administered in this kind of controversies.

The contention of plaintiff is, that the deed by Mrs. De-Walt to Mrs. Brewster was void by reason of the fact that Mrs. DeWalt was *non compos mentis* at the time of its execution. Upon this ground it is claimed that the legal title to the premises remained in Mrs. DeWalt, notwithstanding said deed, and that by her death without children the title vested in her husband under the statute, and so the premises were subject to execution for his debts, without resorting to any proceedings to have the deed of Mrs. DeWalt declared void.

The first matter requiring notice is the nature of the pleadings in the action.

Though the forms of civil actions have been abolished, nevertheless, in substance, a distinction still exists between matters of legal and matters of equitable cognizance; the distinction is inherent in our system of jurisprudence. The code expressly provides for appropriate pleadings and mode of trial for equitable as well as legal controversies, and also for the granting of equitable relief in proper cases. Code, sections 1, 59, 70, 173; *Exchange Bank v. Ford*, 7 Colo. 314; *Danielson v. Gude*, 11 Colo. 92; *Sutton v. Aiken*, 57 Ga. 416.

In this case the averments of the complaint conform in substance to the requirements of an action " for possession and damages," under chapter 23 of the Code—an action similar to "ejectment" under our former practice. It is true, the complaint does not specify whether plaintiff's estate in the premises is " in fee, for life, or for the life of another, or for a term of years," as required by section 267 of the Code. But it does state in an unqualified manner that plaintiff was the " owner and entitled to the possession " of the property. The property was real estate of ordinary description—as lots and block situate in the city of Leadville, Lake county, Colorado. The term " owner," when thus used, imports an absolute owner—as the owner in fee of real property. *McFeters v. Pierson*, 15 Colo. 203.

The prayer of the complaint is limited to a demand for judgment against defendants for "possession of said premises," and for " damages for the unlawful detention thereof."

The answer of defendant Elder contains a general denial of " each and every allegation contained in the said plaintiff's complaint; " also, a special defense in which it is alleged, in substance, that said defendant was seised and possessed of the premises in fee simple.

The bill of exceptions shows that the cause came on regularly for trial upon the same day the replication was filed, February 11, 1889. On the same day, whether before or after the filing of the replication does not appear, defendant was, on motion of plaintiff, ruled " to elect upon which portion of his said answer he will rely." Defendant excepted to the

ruling; but-elected " to stand upon the general denial in his said answer ; " and thereupon " the specific denial therein contained was, on motion of said plaintiff, ordered stricken out." The trial was then immediately proceeded with.

Among other things, it was alleged in the replication that *the deed from Mrs. De Walt to Mrs. Brewster was never signed, sealed or delivered by Mrs. De Walt, and that, as a matter of fact, she did not sign or in any manner execute said deed, and that said deed, if any such exists, is a forgery.*

Under the circumstances, the replication cannot be considered as an additional equitable cause of action intended to procure the cancellation of the deed of Mrs. DeWalt. It is certain that plaintiff did not obtain leave to file it for that purpose ; and defendant had no opportunity of answering its averments.

The only prayer for relief in the replication was " Wherefore plaintiff prays judgment as he has heretofore prayed."

The verdict and judgment in the action were in the ordinary form for an action of ejectment.

Thus the question of the legal title to the premises was the only matter in issue at the trial; and plaintiff could only recover, as in an action of ejectment upon the strength of his own title. He was bound to prove the legal title in himself to entitle him to a verdict. Plaintiff, as well as defendant, claimed the title under Mr. DeWalt. Hence, it was necessary for plaintiff to prove, either, that the deed by De-Walt to his wife, or the deed by Mrs. DeWalt to Mrs. Brewster, was absolutely void. In no other way could the legal title be shown to be in Mr. DeWalt at the time of the levy so as to pass by the sheriff's deed to the purchaser and through him to Reed and thence to the plaintiff. It was not enough to prove that the deed by Mrs. DeWalt was voidable, or that the title conveyed by it was *defeasible* by reason of her want of mental capacity to execute the same ; it was necessary to prove such deed to be an absolute nullity in order to warrant a recovery by plaintiff under the issues. Tyler on Ejectment, 70–75.

There was no evidence of the insolvency of DeWalt at the time he deeded the premises to his wife; nor was there any evidence of any intention to defraud creditors by such conveyance. There was no evidence tending to show that the deed from DeWalt to his wife was void for any reason.

The deeds under which defendant Elder claimed title were all regular and valid upon their face. They were all duly acknowledged and recorded. From the oral evidence, the jury might find that Mrs. DeWalt was not of sound mind and disposing mental capacity when she executed the deed to Mrs. Brewster; but the official certificate of acknowledgment proved *prima facie* that the deed was duly executed and acknowledged by Mrs. DeWalt on the day of its date, January 4, 1883; and there was no direct evidence to contradict such proof of execution.

There was no evidence of actual fraud or circumvention in procuring the execution of the deed by Mrs. DeWalt to Mrs. Brewster; nor was there any evidence of the payment of any consideration for the deed, except the recital in the deed itself. The same is true of *all the deeds* introduced in evidence on the part of both parties.

There was no evidence that the defendant Elder had any knowledge of the condition of Mrs. DeWalt at the time of the execution of the deed by her to Mrs. Brewster. The evidence shows that Mrs. Brewster was a sister of Mrs. DeWalt and was with her during her last illness; but there was no evidence that she witnessed the execution of the deed, nor was there any direct evidence that she knew that Mrs. DeWalt was actually *non compos mentis* at the time of its execution. It does not appear that there was ever any inquisition or finding of lunacy in the case of Mrs. DeWalt in her lifetime.

Instruction No. 5 as given to the jury was as follows:

"The court instructs the jury, that if you believe from the evidence herein that L. M. DeWalt on the 4th day of January, 1883, had not sufficient strength of mind and reason to understand the nature and consequence of her act in

making a deed, then she did not have the power to convey an indefeasible title, and this incapacity inheres in all titles derived from her; the grantee whose title is thus derived must rely on the covenants of his deed.   He risks the capacity to convey of all persons through whom his title has passed; the right of such a person to avoid his or her contract is an absolute and paramount right superior to the equities of other persons, and may be exercised against *bona fide* purchasers from the grantee, and the law does not require the party claiming the premises as against such purchaser, to repay, or to offer to repay the amount paid by him for said premises."

It would have been more accurate to have said, *at the time of executing the deed to Mrs. Brewster*, instead of specifying the date as *January* 4, 1883.   For, though the official certificate showed that the deed was executed and acknowledged on that particular date, yet it was possible for Mrs. DeWalt to have had sufficient capacity or strength of mind to execute the deed during one part of said day and not during another part.   Such verbal inaccuracy in an instruction would not be important, except in a case where from the nature of the evidence it might tend to mislead the jury.

The foregoing instruction, however, is subject to a more substantial objection.  From its language the idea is conveyed that if Mrs. DeWalt did not have mental capacity to convey an *indefeasible* title, then her deed must be held absolutely void.   Such is not the law applicable to the issue then on trial; for if the deed executed by Mrs. DeWalt conveyed any title, it certainly conveyed the legal title as it purported to do.   Hence, even though such title was a defeasible one— even though the absolute paramount right to avoid such deed remained in the grantor and passed to the surviving husband and thence by judicial sale and mesne conveyances to plaintiff—still, such absolute paramount right was ineffectual to support plaintiff's claim to the legal title.   The legal title conveyed by the deed of Mrs. DeWalt though defeasible was, until properly avoided, a bar to plaintiff's action as

pleaded. A defeasible title is one that is "capable of being annulled or made void "—not one that is already void, or an absolute nullity. Webster's Dictionary.

Instruction No. 4 is subject to the same objections, in substance, as No. 5. Considering the issues it declares in effect that a deed not valid is void;—in other words, that a deed voidable by reason of the insufficient capacity of the grantor cannot be made the basis of any protection to the grantee.

It is not to be denied that there are judicial decisions to the effect that the deed of a person wanting in mental capacity to execute the same is void, not merely voidable. Such decisions are based upon the proposition that a sound mind capable of transacting business is essential to the execution of a deed, and that if the mind of the person named as grantor in the deed is wanting in mental capacity to understand, appreciate and consent to the act of execution, then, the deed is not, in law, executed at all, but is void, a mere nullity, and carries with it no estate, right or interest whatsoever. Such logic often leads to unreasonable and inequitable results, and the doctrine based thereon has not been generally accepted by the courts. On the contrary, the general current of authority, ancient and modern, is to the effect that the deed of an insane person, *before an inquisition and finding of lunacy*, though voidable, is not *necessarily* void. It has been repeatedly held that such a deed may be ratified and confirmed by the grantor when restored to sanity ; and, also, that an innocent grantee for value, or his successor or representative under such a deed, may, under certain circumstances, be entitled to relief.

The terms " void " and " voidable," as applied to deeds of conveyance, are often used by law writers without proper discrimination. *Stephens v. Clay*, 17 Colo. 489. Indeed, it is sometimes difficult to apply the term " void " to such a subject with entire accuracy.

To illustrate : When the owner of certain real estate signs, seals and delivers an instrument of writing, having the form and containing all the substantial parts of a deed purporting

to convey such estate, it can scarcely be said with propriety that such instrument is absolutely void for all purposes. It is true, such deed may be voidable; it may be subject to cancellation; it may be annulled and rendered of no effect whatever; but it is a solecism to say that that which has an actual, tangible, physical existence, is nevertheless a nullity, and has no existence whatever. The more accurate and logical as well as the more practical and equitable rule would seem to be, to hold that such a deed having an existence in fact, has also such effect in law, as may be necessary to preserve and protect the rights and interests of parties thereto and thereunder, until the same can be judicially examined and the true effect thereof determined. *Allis v. Billings,* 6 Metc. 415.

In the majority opinion it is said of Instruction No. 5 that perhaps the court would have been justified under the circumstances in instructing the jury that the conveyance by Mrs. DeWalt was absolutely void, and that the giving of the instruction in the more modified form, if error at all, was error in favor of appellant of which he has no right to complain. To my mind the opinion thus expressed is clearly erroneous.

First: The issue as framed was triable by jury as a matter of right, Code, sec. 173; the issue was actually tried by jury upon oral evidence; the evidence was conflicting upon material matters necessary to the determination of the issue; hence, the issue as framed not being of equitable cognizance, it was the duty of the trial court to submit the same to the determination of the jury upon the evidence under proper instructions. The evidence being conflicting, it was not the province of the trial court to decide the facts according to its own judgment. So it is not the province of this court under our practice to try and determine such issues upon conflicting evidence given orally before the jury and brought here only by written transcript. The province of this court under such circumstances is limited to the inquiry whether the cause was tried below without substantial or prejudicial error.

Second: Plaintiff alleged and sought to maintain his cause upon the ground that Mrs. DeWalt as a matter of fact did not sign or in any manner execute the deed of conveyance to Mrs. Brewster, and that said deed, if any such existed, was and is a forgery. This was the only ground upon which plaintiff could recover upon the issue as framed. To warrant a verdict in favor of plaintiff, the proof must correspond to his allegations. How, then, can it be maintained that it was an error *favorable to defendant* to allow plaintiff to recover, not upon the ground that the deed to Mrs. Brewster was a forgery, or that Mrs. DeWalt did not in fact execute such deed, but upon the ground that though she did execute it in fact, yet plaintiff might recover if the jury should believe from the evidence that she did not have the power to convey an *indefeasible* title?

Upon investigation I am firmly convinced that the better doctrine is that a deed executed by an insane person is not necessarily void. Such a deed may undoubtedly be annulled, if equity requires it, by a court of competent jurisdiction upon due trial under proper pleadings and proofs. By the proper procedure the grantor or his representative may be relieved from all effects of the deed; or, the grantee or his representative may have relief as the circumstances, equity and justice of the case may require.

On such trial, evidence of notice, or want of notice, fraud or good faith of the party or parties claiming under such deed, the consideration, if any, actually received or paid for such deed, and other pertinent facts and circumstances connected with the transaction, may require consideration. In order that such trial may be properly conducted, the facts upon which the parties respectively rest their claims for relief, should be set forth in the pleadings.

On such trial the burden of proving insanity rests upon the party alleging it; but insanity being proved, the burden of establishing any claim to relief against such insane person or his representative, rests upon the party claiming such relief.

It is unnecessary in this case to consider how a previous

inquisition and finding of lunacy would affect the rule as to the burden of proof; it is, also, unnecessary to determine whether the consideration actually received or paid must be returned to a party holding or claiming under a deed of an insane person, before such deed will be set aside; a decision upon such questions at this time would be extra-judicial for want of evidence in the record.

These views are supported by the standard text writers.

"Idiots and persons of non-sane memory, infants and persons under duress, are not totally disabled either to convey or purchase, but *sub modo* only. For their conveyances and purchases are voidable, but not actually void." 2 Blackstone, *291.

"The general rule is, that sanity is to be presumed until the contrary be proved; and, therefore, by the common law, a deed made by a person *non compos* is voidable only, and not void." 2 Kent, *451.

"The deed of an insane person is not void, but it is voidable." 1 Parsons on Contracts, *384.

"The ground upon which courts of equity now interfere, to set aside the contracts and other acts, however solemn, of persons who are idiots, lunatics and otherwise *non compotes mentis*, is fraud. Such persons being incapable in point of capacity to enter into any valid contract, or to do any valid act, every person dealing with them, knowing their incapacity, is deemed to perpetrate a meditated fraud upon them and their rights." 1 Story's Eq. Juris. § 227.

"In general a lunatic, idiot, or person completely *non compos mentis*, is incapable of giving a true consent in equity, as at law; his conveyance or contract is invalid, and will generally be set aside. While this rule is generally true, the *mere* fact that a party to an agreement was a lunatic, will not operate as a defense to its enforcement, or as ground for its cancellation. A contract executed or executory made with a lunatic in good faith, without any advantage taken of his position, and *for his own benefit*, is valid both in equity and at law." 2 Pomeroy's Eq. Juris. § 946.

" The true rule would seem to be that only in cases of fraud should the deed be set aside without return of the consideration, but in cases where the deed was taken in good faith the grantee should be reimbursed." Devlin on Deeds, § 76.

These views are also sustained by many adjudicated cases. In an early Kentucky case (1836), *Hunt v. Weir*, 4 Dana, 349, Judge Marshall, delivering the opinion of the court, said: " But, further, the fact that Mitchell was insane at the time of executing the deed in question, if fully established, would not be sufficient to authorize the rescission asked for by the complainant; unless it also appeared, either that the deed had been set aside, or at least that such proceedings had been instituted for that purpose as must, in all probability, result in avoiding it. For if the grantor were insane, still his deed passed the legal title, subject to be defeated, not by the mere allegation and proof of the fact of insanity, by anyone who might feel an interest in overturning the deed; but, after the death of the grantor, only at the election of *his heirs*, made under circumstances which do not preclude them from setting it aside."

Again, in 1879, in *Rusk v. Fenton*, 14 Bush (Ky.) 490, the supreme court of Kentucky declared: " 'The weight of modern authority is to the effect that the contract of a lunatic, particularly if made before inquest, like that of an infant, is voidable only." And it was held: " If an innocent purchaser from a lunatic, without knowledge of his insanity, cannot be put *in statu quo*, the conveyance of the lunatic should not be set aside at the suit of the lunatic or his personal representative."

In *Gribben v. Maxwell*, 34 Kan. 9, Chief Justice Horton, delivering the opinion of the court, said: " We think, however, the weight of authority favors the rule that where the purchase of real estate from an insane person is made, and a deed of conveyance is obtained in perfect good faith, *before an inquisition and finding of lunacy*, for a sufficient consideration, without knowledge of the lunacy, and no advantage is taken by the purchaser, the consideration received by the

lunatic must be returned, or offered to be returned, before the conveyance can be set aside at the suit of the alleged lunatic, or one who represents him."

In *Boyer v. Berryman*, 123 Ind. 452, Mr. Justice Elliott, delivering the opinion of the court, said : " It is now settled by our decisions that a deed of a person of unsound mind, made before office found, to one who has no knowledge of the grantor's incapacity is only voidable, and that, in order to avoid it, the consideration received must be tendered to the grantee."

In *Eaton v. Eaton*, 37 N. J. L. 109, it was held : " The deed of conveyance of a person of unsound mind, executed before an inquisition and finding of lunacy, if taken in good faith is voidable only, and not void."

In *Pearson v. Cox*, 71 Tex. 246, it was held : " Where the homestead is conveyed by deed regular in form and duly acknowledged by the wife, and the deed is attacked on account of the insanity of the husband, such deed is not held to be void, but only voidable. To avoid a deed the rules of equity demand that the party seeking the rescission must pay back the consideration received under the deed. This applies in case of homestead where the deed is avoided on account of the insanity of the husband."

In *Riggan v. Green*, 80 N. C. 236, it was held : " A deed executed by a lunatic is voidable only and not void; and equity will not interfere to set aside such deed, where the grantee cannot be put *in statu quo*, or where the benefit received by the grantor is actual and of a durable character ; *Therefore*, in an action by the heirs to recover land upon the ground of incapacity of their ancestor to make a deed, and it appeared that the purchaser paid full value, without advantage taken and without notice of such incapacity, that the deed was attested by a brother and two sons of the grantor, and the purchase money used for the benefit of himself and family ; *It was held* that they were not entitled to recover."

In *Scanlan v. Cobb*, 85 Ills. 296, it was held : " Where a conveyance of land is set aside in equity on the ground of

the insanity or lunacy of the grantor, and an account taken, the grantee, having purchased in good faith, without any knowledge of the alleged insanity, will be entitled to be reimbursed that which he has paid on the same. Where a purchase from an insane person is made, and a conveyance obtained in good faith, for a sufficient consideration, without knowledge of the insanity, the consideration must be returned before the conveyance can be avoided. Where a person, apparently of sound mind, and not known by the other party to be otherwise, enters into a contract which is fair and *bona fide*, and which is executed and completed, and the property which is the subject-matter of the contract cannot be restored so as to put the parties *in statu quo*, courts have held that such contract cannot be set aside either by the alleged lunatic or those who represent him."

In the case of *Young v. Stevens*, 48 N. H. 133, it was held: " Where a person, apparently of sound mind, and not known to be otherwise, enters into a contract for the purchase of property, which is beneficial to the purchaser, and otherwise fair and *bona fide*, and which has been fully completed, paid for, and enjoyed, and cannot be restored so as to put the parties *in statu quo*, such contract will not afterwards be set aside either by the lunatic or his representative."

It is true, there are learned judicial opinions contrary to the foregoing. Hon. Joel P. Bishop, a most philosophical and trustworthy law writer, in his Commentaries on the Law of Contracts discusses this subject as follows :

" The authorites on this question are in a degree conflicting or indistinct; but, by most and probably all opinions, it is sometimes a material circumstance that the sane person did not know of the other's insanity. In England, the doctrine seems to be general, that, whenever the party contracting with the insane person proceeded honestly and fairly, and without either actual knowledge of his insanity or anything to excite suspicion of it, and the contract is equitable and just, and is on one or both sides executed, it will be binding on the insane person unless the parties, on its rescission, can

be placed *in statu quo*.  And nearly or exactly the same thing is held in a part of our states.  For example, the lunatic has. been compelled to repay money lent under these circumstances.  Especially in equity has this doctrine been enforced; resting, it is said, on the maxim that he who seeks equity must do equity.  Consequently the equity tribunal will not set aside, on the ground of insanity, a conveyance of lands made for value to a purchaser in good faith, who was ignorant of the grantor's mental condition.  On the other hand, it is by many of our courts held, at least at law, that, since. insanity incapacitates one to make a contract, the mere fact of the other party's not knowing it does not render good what he was legally incompetent to do.  It is difficult to resist the force of this proposition, especially as it harmonizes with what is held in respect of the contracts to infants.  And under the title Infancy, the reader will see how the doctrine ought to be carried out.  At the same time, and as a qualification of what would thus appear to be the better rule, it may well be held, in accordance with what has already been laid down, that where, in these circumstances, the parties cannot on rescission be placed *in statu quo*, the law creates a promise from the insane person to remunerate the other for whatever benefit was actually conferred and enjoyed. * * *. The doctrine of some of the cases appears to be, that contracts impeachable for insanity are absolutely void.  And. there may be. those in which it should be so held.  Yet, as in infancy, there can be but little just ground for the void. * * * In most cases, the contract is held to be merely voidable by the insane person or his legal representatives; and, while not so avoided, binding on the other party.  Admitting of ratification, if, for example, it is a deed of lands or conveyance of personalty in the executed form, it will, without such affirmance, transmit the *seisin* or ownership to the other party."  Bishop on Contracts, §§ 970–975.

My conclusion is, that upon the issues joined in this action,. it was error for the court by its charge to allow a recovery upon the ground that Mrs. DeWalt did not have power to

convey an *indefeasible* title. It was not sufficient to sustain the issue on plaintiff's part that the title conveyed by Mrs. DeWalt was defeasible merely—that is, voidable, but not .void. Unless the evidence was sufficient to prove that the deed purporting to have been executed by Mrs. DeWalt was not in fact executed by her;—that is, unless the evidence proved such deed to be a forgery or an absolute nullity as alleged, conveying no title whatever, the verdict should have been for the defendant, and the jury should have been so instructed under the issues as framed.