# CHARLESTON.

ROCK, ADM'R *et al. v.* MATHEWS *et al.*

Submitted June 18, 1891.—Decided November 14, 1891.

CANCELLATION—COMPOUNDING FELONY—IN PARI DELICTO.

Equity will not entertain a bill to cancel instruments of indebtedness given under an agreement to compound a felony or stifle its prosecution, as the parties are *in pari delicto.*

*Campbell & Holt* for appellants, cited 2 Pom. Eq. Juris. §
939, 940; Ad. Eq. (s. p.) 175; 3 Rand. 214; Bish. Con. (Eng.
Ed.) § 493; 22 N. E. Rep. 49; 74 Mich. 302; 45 N. W. Rep.
912.

*Simms & Enslow* for appellees, cited 78 Me. 482; Id. 473;
61 Me. 227; 3 W. Va. 215; Id. 232; 9 W. Va. 359; 24 W.
Va. 217; 36 Mich. 345; 46 Wis. 313; 82 Ill. 485; 59 Mo.
125; 7 Ohio St. 299; 15 Gray (Mass.) 468; 25 N. H. 325;
60 Barb. (N. Y.) 80; 78 Me. 482; Id. 473; 91 Pa. St. 73;
115 Mass. 367; 10 N. H. 494; 22 Pick. 167; 3 B. Mon. 11;
45 Tex. 539; 2 Woods (U. S.) 372; 9 Wis. 476; 12 Pet. 241;
55 Mich. 196.

BRANNON, JUDGE:

This is a bill filed in the Circuit Court of Cabell county
by James Rock and others against R. A. Mathews and
others, alleging, in effect, that J. W. Verlander as post-
master at Huntington gave a bond with Mathews, Harvey,
Enslow and Russell as sureties, and that Verlander misap-
propriated to his own use public moneys, whereby the
sureties became liable; and that said sureties while their
liability was unpaid, and while Verlander was in danger of
arrest and prosecution for embezzlement, went to James
Rock and Mary A. Rock, the father and mother of Mrs.
Verlander, and to Mrs. Verlander, who were in no wise
liable for such money, and demanded that they and said J.
W. Verlander should execute a promissory note, secured
by a deed of trust, payable to said trustees, for three thous-
and dollars, the amount of the defalcation, so that they
might not lose by their suretyship, and represented that on
compliance with such demand, they would discharge the
amount of the defalcation, and further represented to said
Rock and wife and Verlander and wife, that unless said
note and security should be given, they would have Ver-
lander arrested and prosecuted for embezzlement and sent
to the penitentiary; and that to save Verlander from pros-
ecution, and no other consideration, they executed a note
for three thousand dollars, payable at the bank of Hunting-
ton to said sureties, and a deed of trust on certain real and
personal property to secure it; and that said sureties then

settled the defalcation with the United States; that the trustee having advertized the property for sale, said sureties proposed that if said debtors would renew the note of three thousand dollars and execute certain other notes, and a deed of trust to secure them, no sale would be made under the first trust, but it would be released and further time given; and accordingly a new note for said three thousand dollars and a deed of trust to secure it were given by said parties; and that all the property embraced in this deed of trust was the property of Mary A. Rock, and none of it the property of J. W. Verlander; that under this second deed of trust the trustee was about to sell property conveyed by it to satisfy said note for three thousand dollars; that the renewed note was for the original note of three thousand dollars executed in expectation that J. W. Verlander would be relieved from prosecution, which note was for a consideration illegal and contrary to public policy; and the bill prayed that the sale be enjoined and the note and deed of trust canceled. An injunction was granted, and a motion to dissolve and a demurrer were overruled; and the defendants having answered and evidence having been taken, on the final hearing, the injunction was dissolved and the bill dismissed; and from this decision the plaintiffs appeal.

The first question arising on the face of the bill is, Does the bill show ground for cancellation of the deed of trust and note? The bill charges that they were made for compounding, or with the expectation of preventing and stifling a criminal prosecution, and are therefore void as against public policy.

According to the bill the parties who gave the note and deed of trust were as fully aware of the character of the transaction and the illegal purpose as were the beneficiaries under those instruments, and were participants in the transaction. Can they have relief or are they precluded because equally guilty with their adversaries?

Mr. Pomeroy in his late and elaborate and learned work on Equity Jurisprudence, Vol. 1, § 402, says: "Whenever a contract or other transaction is illegal and the parties thereto are in contemplation of law *in pari delicto*, it is a

well settled rule, subject to only a few special exceptions depending upon other considerations of policy, that a court of equity will not aid a *particeps criminis*, either by enforcing the contract or obligation while yet it is executory, nor by relieving him against it by setting it aside, or by enabling him to recover the title to property which he has parted with by its means. The principle is thus applied in the same manner where the illegality is merely a *malum prohibitum*, being in contravention to some positive statute, and when it is *malum in se*, as being contrary to public policy or good morals." In the latter class he ranks compounding felony.

It is a known maxim that he who comes into equity must come with clean hands. Lord Chief Justice WILMOT said that "all writers upon our law agree in this : No polluted hand shall touch the pure fountain of justice," and that those so entering the temple will be expelled with the anathema, *Procul, O ! procul este profani.* In the Supreme Court of Massachusetts, in *Atwood* v. *Fisk,* 101 Mass. 363, the principle is well stated thus : "The meaning of the familiar maxim *in pari delicto potior est conditio defendentis,* is simply that the law leaves the parties where they stand ; not that it prefers the defendant to the plaintiff, but that it will not recognize a right of action founded on the illegal contract, in favor of either party against the other. They must settle their own questions in such cases without the aid of courts." In *Capehart* v. *Rankin,* 3 W. Va. 571, it was held that courts will not aid parties to illegal contracts which are executory only to recover thereon, and where it is executed a court will not aid a *particeps criminis* in seting it aside. See *Dodson* v. *Swan,* 2 W. Va. 511.

In *Helsly* v. *Fultz,* 76 Va. 671, it was held to be a rule of courts of equity "not to assist one wrongdoer against another ;" that if the agreement be executory, it will neither be enforced nor canceled ; if executed, it will not be set aside and the property restored ; that " in all such cases the parties will be left as they placed themselves."

On this principle in *Atwood* v. *Fisk, supra,* the Supreme Court of Massachusetts held that a bill in equity will not lie to compel the surrender or cancelation of a promissory

note and a mortgage to secure it on the ground that the consideration for them was a promise of the payee to forbear to prosecute for embezzlement. In *Smith* v. *Rowley*, 66 Barb. 503, a wife sought to annull a deed conveying property to prevent the prosecution of her husband, but she was refused relief because the contract was against public policy and she a participant.

In *Allison* v. *Hess*, 28 Iowa 389, a conveyance had been made to compound the felony of a son, and the court refused relief, saying, "The rule seems to be well settled that where a contract is illegal, whether because it is *malum in see* or *malum prohibitum*, the law will not afford affirmative relief to either, but leave the parties as it found them." In *R. R. Co.* v. *Mathers*, 71 Ill. 598 held that if a party convey estate in consideration of doing an illegal act, no relief will be given.

In *Haynes* v. *Reed*, 102 N. Y. 372, 55 Am. R. 815, held, "one can not maintain an action to recover money paid on a note wholly or partly to compound a felony, though the note was procured by duress and undue influence." There was a threat to accuse a son of crime. The court said that it could not agree with the doctrine that if the party was influenced by duress, and at the same time both parties intended compounding a felony, they were not *in pari delicto*, and that it was enough that the vice of compounding was part of the contract operating in the minds of both parties, thus placing them on an equality. Same principle in *Swartz* v. *Gillot*, 1 Chan. (Wis.) 207; 2 Pin. 238; *Harington* v. *Bigelow*, 11 Paige 349.

But it is argued for appellants that while the doctrine above stated may be true as to contracts completely executed, as where money has been paid on the illegal contract, or property has been actually passed under it, yet it does not apply where the debt has not been paid, as here. It is said that the proper words of the maxim are in *pari delicto melior est conditio possidentis*, not *defendentis*, and where the word *defendentis* is used it is to be regarded as equivalent to *possidentis*; and thus it shields only one who has become the *possessor* under a completely executed contract of the thing sought to be reclaimed by the suit, and does not apply

where the contract has not been executed, and the defendant has not possession. That in this case, as the debt has not been paid, the maxim does not apply.

I regard it so far as the parties to the contract are concerned as completed. The deed of trust has passed the legal title to the trustee, leaving the grantors only an equity of redemption. If it were an absolute conveyance of the absolute estate, certainly the maxim would apply. The party could not sue on the note, but the. debt is one thing, the deed of trust another.

It seems to me that the true expression of this great equity maxim is, "In *pari delicto potior est conditio defendentis vel possidentis;* but it is differently stated in different bosks. In 1 Story, Eq. Juris. § 63, the closing words are *"possidentis, et defendentis,"* while in § 298 they are *"defendentis, et possidentis."* In Brom's Leg. Max. 290 it reads *"*in *pari delicto potior est conditio possidentis* or *defendentis,"* while on page 729 it is *"potior est conditio possidentis."* In Black's Law Dic. it is *"In pari delicto potior est conditio possidentis (defendentis.)"* In Bouv. Law Dic. it is *"In pari delicto potior est conditio defendentis* (or *possidentis.)"* But, though a critical comparison of these differing expressions of the maxim would suggest distinctions, they would be rather refined. I think the meaning is that where the maxim applies, it leaves the possessor of the property in possession, or favors a party defending by simply refusing to interfere. But in this case it is immaterial, as I regard the defendants as "possessing" the property sued for.

A deed of trust is in effect a mortgage, needing, however, no application to a court to foreclose it. It is laid down that though a. mortgage upon an illegal consideration is void, so that a court will not aid the mortgagee in its enforcement, yet it "will not aid the mortgagor to obtain a cancellation of the incumbrance. Both parties are left without remedy when the contract is one prohibited as immoral or against public policy." 1 Jones, Mortg. § 619.

In this case the plaintiffs ask distinct affirmative relief, and have to plead the illegal contract as a ground of such relief, which fact is generally regarded as a test of the applicability of the maxim.

Great stress is laid by counsel for appellant upon the case of *Kipworth* v. *Strother*, 3 Rand. 214, sustaining a bill to enjoin a judgment for a gaming debt. The statute expressly declared a judgment for a gaming debt void. I do not, however, question, in view of the doctrine laid down in 1 Story Eq. § 303, and in 5 Gratt. 649 and 6 W. Va. 91, that equity will give relief in gaming contracts as exceptions to the principle expressed in the maxim above quoted; but this interference in gaming contracts is an exception to the general rule to further a public policy, the courts having concluded that such policy is better subserved by giving active relief.

In the U. S. Supreme Court in *Sample* v. *Barnes*, 14 How. 70, where a judgment was sought to be enjoined on the ground that the contract was illegal, the court refused relief "because the complainant was in *pari delicto* with the other party." Now, this is authority not only for the application of the general principle above stated, but it shows that the fact that the plaintiff had not yet paid over the money, but yet possessed it, as in this case, did not save him from the maxim and give him a place in court; it shows that the court simply left the parties where it found them because they were *in pari delicto*. So, the bill itself shows a case calling for the expulsion of the plaintiffs from a court of equity.

Let us now look at the case under the light thrown on it by the answer and evidence. Under this light it falls far short of the case made by the bill and shows no duress or compulsion on the part of the sureties, no threat of prosecution, no agreement to compound or stifle it, and no culpable act on their part. The post-office inspector ascertained a shortage in the accounts of Verlander as postmaster and demanded that it be arranged by a given time. Verlander as a means of raising three thousand dollars to meet it proposed to his sureties to make a note to be signed by Mr. and Mrs. Rock and his own wife and secured by a deed of trust, and to be endorsed by the sureties and discounted by the Huntington Bank. This would answer the purpose of meeting the government's debt and save the sureties. Enslow called at Verlander's house to see him,

but did not find him, but meeting Rock and Verlander's wife, said to them that Verlander was in debt to the post-office, and all that could be done to save him was for Mrs. R. to sign a note and he would get the money from the bank, and Rock said that neither he nor his wife would do so. This is Rock's statement. Mrs. Rock says only that she heard Enslow say to Mrs. V. that if she, Mrs. R., would sign a note he would get the money. Mrs. V. says that Enslow said that the shortage ought to be fixed, and she asked him how it could be fixed, and he replied that the only way he knew was to get her mother to give notes, and she said she was afraid her mother would not do so, and he said he would let them talk it over till morning and see her again.

Thus, by the evidence of the three parties most interested to say so, Enslow made no agreement to compound a felony or stifle a prosecution, or threat to prosecute if it was not settled, or promise or declaration or even opinion that if settled, there would be no prosecution. It is not claimed that any other surety took any active part in the matter, nor that Enslow on any other occasion made any agreement to stay a prosecution, or threat to prosecute or not according as the matter should or should not be settled. Mr. and Mrs. Rock say that the next morning Capt. Gibson, Mr. Stout, a notary, and Russell one of the sureties, came to their house, and Gibson asked if they would sign those papers, and Mr. Rock replied that neither he nor his wife would do so, and he said then there was no chance but for Verlander to go to the penitentiary.

Mrs. Rock then asked him what he was going to do, and he replied she could suit herself, and thereupon Mamie Verlander went to her grandma crying, saying, "Ma, will you let papa go to the penitentiary?" when her grandmother also wept. Capt. Gibson then called Mrs. R. into the music room away from Russell, and said, "Will you let your little grandchildren be disgraced by not signing these notes? We have issued a warrant for him to bring him to Charleston. The train will soon be here, and if we don't make haste, we will be too late." Mrs. R. says she then signed them, and Russell asked to look at the papers and said that is all right. I will pay the money." Mr. Rock said that

Gibson said the U. S. inspector had a warrant of arrest in his pocket, differing from his wife as to who had the warrant. He says they became frightened and signed the papers to save Verlander from the penitentiary and his family from disgrace. Mrs. R. does not in her version make Russell present when Gibson said Verlander would go to the penitentiary.

This is the strength of the case as made by the plaintiffs by their own evidence. Russell said nothing in this interview—indeed, was not present when the conversation took place between Capt. Gibson and Mrs. Rock in the music room. He was the president of the bank and was there to see that the papers were such as the bank would discount and that he could be a witness to their execution, as it was alleged she had denied signing in the case of another note.

Mrs. Verlander had sent for Capt. Gibson, an attorney, to advise with her about the unfortunate state of things, as she says. He was not acting for the sureties, but for the interest of the other parties. Are they responsible for his action? It was held not in *Compton* v. *Bank*, 96 Ill. 301 (36 Am. R. 147.) These sureties having a just debt, or a right to be indemnified, is a security taken, which enures to their benefit to be avoided by the advice or influence of one who acted not for them?

Taken in the strongest view in favor of plaintiffs it amounts only to this, that they made the note to raise money to pay the debt under the hope or expectation that it would save Verlander from prosecution, with no agreement on the sureties side to compound or stifle or prevent it. Is it possible that when these parties had a just demand or right to indemnity, merely receiving this security vitiates it? It is true, as laid down in Bishop on Contracts, § 493, that where the agreement is not technically a compounding, but tends to impede or discourage the orderly prosecution of crime, public policy is violated; that it is so, for example, of an undertaking to stifle a prosecution, or influence its favorable termination, and it is the same of a promise or security given with a mere expectation that it will have such effect, or prevent a prosecution from being commenced. But in § 494 he says: "This doctrine does

not render void a promise or security given as mere amends for the civil wrong involved in the transaction. For example, a thief may make a valid promise to restore or pay for the thing stolen. Even a threat of prosecution will not invalidate civil adjustment if in itself fair and correct." And Wharton's Crim. Law § 1559 says: "The bare taking of one's goods back again or receiving reparation is no offence, unless some favor is shown, or agreed to be shown to the thief."

These sureties did nothing objectionable. The whole case to one reading it makes it clear that they did not induce the giving of the note anxious though doubtless they were to be saved from loss; for the note was Verlander's effort to raise money for his own use to pay a debt of his to the government; and it was not the threat of the sureties that induced his father-in-law and his wife to incur the liability. The evidence shows that Mrs. Verlander was anxious to pay in order to retain the office; and it is likely that the tears of the daughter of Verlander were eloquent with her grandma, and the desire to save her blood from shame and disgrace, a potent argument moving them in their action. Verlander himself is dead, and his lips have not spoken in the case.

When we take the evidence of the defence the weak case made by the plaintiffs is utterly overthrown. The evidence of Enslow & Gibson contradicts in every material point the evidence of the Rocks. Enslow says he did say to Mrs. Verlander and Rock that if Verlander was really in default and failed to pay when the Government demanded the money it would be a criminal act, and he would have to account for the money, or be prosecuted; but that he never stated that he had a warrant for Verlander, or that the sureties would arrest him, and never requested Rock to sign a note; and was not present when it was signed. Gibson says he was sent for by Mrs. Verlander in the trouble, and she or her daughter asked him to go to see Rock and his wife, which he did, and they flatly declared they would do nothing to help Verlander; but after talking awhile asked his advice, and he told them it was purely a family matter, and he would not advise any course; that later he and Rock and Mrs.

Verlander and her daughter talked the matter over, and still later Rock came to him to announce to him that they would arrange the matter. He says when at the house when the papers were executed he still refused to advise any course, and took Mrs. Rock out of the room in order that Russell might not hear their conversation; that he never said that he or any one else had a warrant, never mentioned a train or that it would soon come, and never threatened; that on the first visit, when Russell was not present, he did tell them that he had heard that the commissioner was going to arrest Verlander, if the matter was not arranged, but it was not as a threat but as counsel and friend of the family. He states, " This is the first time I ever heard that the deed of trust was not made voluntarily, and it is the first time I ever heard that any threats were made." Russell says that on the occasion when the deed was made, no business was talked of between Gibson and the Rocks in his presence, but they went to another room; and it thus appears that if Gibson did say that Verlander would go to the penitentiary unless the matter was fixed, Russell was not present or a party to it by even silence.

I think it clear that after full consideration by Verlander, his wife, his daughter and Mr. and Mrs. Rock they voluntarily made this note to retain the postoffice or to avoid prosecution, and that there was no unlawful agreement express or implied on the part of the sureties. Duress, I think properly, is not relied upon as an element in the case.

I think the Circuit Court of Cabell passed properly on the evidence and law, and its decree is affirmed.

Affirmed.