[No. 7607]

## Godding v. Hall, Receiver.

1. Contracts—*Consideration*—Defendant's husband had been in the absolute control of a bank, had absorbed its funds, and caused its failure. The wife was possessed of real estate which the husband had acquired by using his own funds with those of the bank, and conveyed to her without consideration. After the failure of the bank the wife conveyed this real property to a trustee, to secure the depositors of the bank, reciting that she was desirous to do all in her power to liquidate the indebtedness of the bank. *Held,* that the deed was not to be vacated, or set aside, for lack of consideration.

2. ——*Construed*—The deed in question recited that "the assistance of the late officers of the bank is required to assist in the realization of its assets," and the wish and desire of the grantor that such officers "shall not be hampered or delayed by trivial or other persecutions or prosecutions, and therefore this conveyance is upon the condition that their time and attention be left for such assistance." The deed was accepted by the trustee after consultation with the receiver of the bank. *Held,* the recitations of the deed do not import an agreement that the husband shall not be criminally prosecuted. *Held,* further that the condition expressed in the deed was a condition subsequent, and by reason of its indefiniteness as to the character, time, or duration of the services to be rendered by the officers of the bank, and that, if given the effect to relieve them of prosecution, was illegal, was to be rejected.

3. Deeds—*Conditions Subsequent,* are not favored by the law, and are strictly construed because they tend to destroy estates.

*Appeal from Otero District Court.*—Hon. W. R. Morris, Judge.

Messrs. Glenn & Gobin, and Mr. J. H. Voorhees, for appellant.

Mr. Fred A. Sabin, for appellee.

Mr. Justice Scott delivered the opinion of the court:

John E. Godding, one of the defendants below, organized the State Bank of Rocky Ford in the town of Rocky Ford in this state, in the year 1887. He remained

as president of the banking corporation and in control of said bank until the 2nd day of January, 1908, when the bank commissioner of this state closed the doors of the bank, and made application for the appointment of a received. C. M. Hall, the appellee, was appointed receiver of the bank, and has ever since acted as such receiver. Prior to the organization of· the bank Godding organized a town-site company corporation of which Godding was one of the principle stockholders, and which laid out and platted a certain portion of the present town of Rocky ·Ford.

All of the real estate involved in this action was a part of the said town-site company's property. This consisted of lots one, two, three, four, five and six in block nine of what is known as the second filing. Upon lots five and six there was a stable, and upon lots one, two, three and four of said block nine, there was erected a dwelling house by the said Godding. The legal title at the time of this action, to the said real estate was in the name of the defendant Emma A. Godding, wife of the defendant John E. Godding.

There is also involved lots four and five in block No. 3A, Rocky Ford second filing. At the commencement of this action the legal title to an undivided one-half interest in these lots was likewise in Emma A. Godding, and the legal title to the remaining undivided one-half interest in said lots was in Mrs. T. F. Godding, wife of the brother of John E. Godding. On these lots the defendant John E. Godding constructed the bank building occupied by the said State Bank of Rocky Ford.

The original complaint alleged in addition to what has been above stated, that ever since the organization of the bank and until the failure, it was under the immediate control, management and direction of the defendant John E. Godding as president, and E. J. Smith as cashier; that

no meetings of the board of directors of the bank or its stockholders were called or held as in manner provided by law, and that at no meeting of the board of directors or stockholders was any of the business of the bank transacted. That at the time of the failure, the books of the bank showed deposits in the sum of $442,418.39 and that its indebtedness to depositors and other creditors was $523,021.93.

It was then alleged that all the real estate above described, was conveyed by J. E. Godding to his wife Emma A. Godding without any consideration, and that the premises were purchased by Godding out of the funds of the bank. Further, that beginning in January, 1909, John E. Godding commenced the construction of the dwelling house on said premises; that he paid the entire expense of the construction of the said dwelling in the sum of $6,-500.00 by drawing his personal checks on the said bank, in which he had no money at the time on deposit, and all of which constituted an overdraft; and that by collusive arrangement between Godding the president, and Smith the cashier, these payments were so made; that the dwelling was completed by the 2d day of July, 1900, and that at that time the overdraft of Godding was in the sum of $7,609.85; that this sum was on said day placed to the credit of Godding, and his account balanced upon the books of the bank; that in truth and in fact Godding paid no money to the bank, but there was placed in the safe a memoranda of this amount which was thereafter carried as a cash item; that none of these funds were ever paid or restored to the bank thereafter.

The complaint further alleged that shortly after the failure of the bank, to-wit, on the 17th day of January, 1908, the defendant Emma A. Godding executed her deed of trust to one Robert M. Pollock, in which she conveyed to the said Pollock all of the premises above referred to,

including her interest in the bank property, in trust for the use and benefit of the depositors of the bank, which trust deed will hereafter be more specifically referred to.

The prayer was for a judgment decreeing all of said property to be the property of the bank, and that the conveyance be adjudged and decreed to be one in trust for the creditors of the bank, and that the plaintiff, receiver, be substituted as trustee instead of the defendant Pollock. Possession of the premises was demanded and likewise an accounting of the rents and profits of the real estate from the date of the said trust deed. Upon motion of the defendants Godding, the court required the plaintiff to separately state and number his several causes of action, whereupon the plaintiff filed his first amended complaint, in two counts. The first count apparently asking that the funds so used in the construction of the dwelling be declared a trust fund, and that such trust be impressed upon the real estate upon which the same was situated. The second count apparently claiming under the trust deed, so executed by Emma A. Godding. Demurrer to the second count was sustained by the court, and the plaintiff was denied the right to amend in that particular. The plaintiff then filed his second amended complaint, on the theory of the court that if the plaintiff was entitled to recover it must be upon the right to impress a trust upon the residence property for the amount of the funds used in the construction of the dwelling. The court found that the amount of money so withdrawn from the bank by Godding and used in the construction of the dwelling, was $5,546.23; that this sum was wrongfully taken by Godding, through the connivance of Smith, from the bank, without any expectation of returning the same, and was taken and used in fraud of the rights of the creditors and depositors of the bank, and that this sum of money in equity should have been held by Godding and preserved for the use of said creditors and depos-

itors; and that it was thus fraudulently used and converted by Godding as the trustee of the creditors and depositors; and the judgment charged and impressed the residence property with a trust to the extent of the said sum of $5,546.23 and declared the same to be a lien upon the said premises, ordered the said lien foreclosed and the premises sold, and the receipts therefrom to the extent of said sum, paid to the plaintiff receiver.

From these findings and this judgment of the court the defendant Emma A. Godding appeals, and the receiver likewise assigns as cross error the refusal of the court to consider the deed as effective and binding upon the appellant, Emma A. Godding.

The testimony does not establish that the funds of the bank were used by Godding in the purchase of any of the real estate described but rather that the said residence lots in particular, were bought and paid for from Godding's interest in the town-site company.

The testimony discloses that at the time of the commencement of the erection of the residence, the bank was in an insolvent condition; that Godding was personally indebted to the bank in the sum of approximately $40,-000.00, that he had no money to his credit in the bank, and that the entire expense of the construction of the dwelling house was paid from the funds of the bank upon Godding's personal checks, all of which payments constituted an overdraft. The checks so drawn and upon which such payments were made, were marked at the time and identified upon the trial of this case, to the extent of the sum found by the court and included in the judgment.

It is contended by the appellant that this sum was afterward paid to the bank by Godding by means of a transfer to it of a certain tract of coal land situated in Weld county in this state.

The facts appear to be that the Godding overdraft on the 2d day of July, 1900, including the sums paid out for construction of the dwelling, amounted to $7,609.85. On that day he was given credit for this full amount, and the book account balanced, simply by the memoranda aforesaid being placed in the same, and by carrying this memoranda as a cash item until some time in June, 1904. Up to that time the bank had never received, in fact, any of this sum, and the carrying of the memoranda as a cash item was merely a fraud, to permit the report of the bank to show such additional amount of cash on hand, rather than in the form of an overdraft; which in fact it was.

It appears that in December, 1903, Godding had an equity in one hundred and sixty acres of coal land in Weld county, title to which had been placed in Earl M. Cranston as assignee, to secure a judgment against Godding. At that time settlement was made of this judgment as to Godding, upon condition of the payment of $4,-100.00 to Mr. Cranston. Godding caused the deed to the property to be made to the bank, and claims to have made a sale to the bank of this land for the sum of $16,000.00, and that the payment therefor was made by the bank, as follows: $4,100.00 paid to Cranston; $7,609.85 in payment of the Godding overdraft, and the remainder, $4,-290.15 placed to the personal credit of John E. Godding.

It is contended by Emma A. Godding that the moneys used in the construction of the dwelling was in payment of money theretofore loaned John E. Godding, by her.

The testimony as to any alleged indebtedness of Godding to his wife at the time of the beginning of the erection of the dwelling, is confined to that of these two witnesses. It is all oral, general and uncertain. No account was kept between them, and not a single specific sum said to constitute any part of such alleged indebtedness is mentioned, nor the time nor place, nor manner in which

any part thereof was created, except that after the construction of the bank building she was credited by the bank on her pass book with certain sums for rent, said to be for the rent of the bank building. These began in May, 1890, but were checked out chiefly by her husband, and about as paid in, so that there was not to her credit in the bank at any time any considerable sum. The last balance made in her pass book, prior to the commencement of the building, was June 1st, 1899, and is in the sum of $55.71.

No pass book is in evidence showing any account of Mrs. Godding with the bank from that date until July 1st, 1901, or for a period of more than two years, during which period the dwelling was erected.

It is shown, however, that during the time the house was building there was received by Godding $999.75, the proceeds of the sale of stock in a building and loan association and placed to his own credit. This stock was in the name of his wife but the record shows that Godding paid for it, and likewise received the proceeds.

In relation to this alleged indebtedness, Godding testifies that he entered a homestead near Lamar, prior to going to Rocky Ford, and at some indefinite time agreed to give his wife an interest in it. He says she had nothing prior to this alleged promise. No title to any part of this homestead appears ever to have been conveyed to her, and she received no money at the time or after its sale.

Godding and his wife estimate that the debt of the former to the latter was from six to eight thousand dollars, based upon no other definite fact than such alleged promise.

The court was fully justified in concluding that at the time the house was being constructed there was no legitimate existing debt upon the part of Godding to his wife.

At the time of the alleged settlement of the overdraft theretofore carried as a cash item, by the transfer of the coal land whereby Godding secured an additional sum of more than four thousand dollars in cash from the bank, beside the sum paid to Cranston for the release of the property, the deed was made direct to the bank, but the testimony indicates that this was not intended as an absolute transfer but rather as security.  Smith, the cashier, testifies upon this point as follows:

"The credit was made to pay an overdraft preliminary to the semi-annual statement of July.  *  *  * We carried it as a cash item.  It ran as a cash item until the latter part of December, 1903.  There was a subsequent item of $4,100.00, which was sent away for the benefit of Mr. Godding on September 11, 1900, or December, 1900.  It was sent to Mr. Cranston in settlement of some of Mr. Godding's indebtedness.  There came back from Mr. Cranston a quit-claim deed to some coal land near Longmont, which deed was made straight to the bank.

"Q. Why was this quit-claim deed made to the bank? A.  I do not know.  In the settlement of December, 1903, Mr. Godding received the equity he was supposed to have in the property at that time.

"Q.  The coal land was to become— A.  A full asset of the bank.

"Q.  Was he thereafter to have any right to redeem or to receive a conveyance of that back to him?  A. Nothing was said specially about that proposition.  I would suppose he was if he paid the amount due to the bank."

Godding testified as follows:

"Q.  Did you have any understanding with Mr. Smith at the time you got the $4,100.00 draft as to what

you were going to do with the coal land, or to whom it would be deeded by Cranston? A. We talked it over.

"Q. What did you agree to? A. I don't remember, our conversation at that time. It is a long time ago. I know we talked it over and agreed how the transaction should be handled.

"Q. Did that property become the property of the State Bank of Rocky Ford at that time? A. The property was turned over to the State Bank of Rocky Ford *as trustee*, at that time practically; that was the agreement. between Mr. Smith and I that it should be so held.

"Q. Why didn't you let this go. to the bank absolutely at that time to satisfy your debt to the bank? A. Because we didn't handle it that way.

"Q. How long after that was it that the state bank became the absolute owner of the coal land. A. I think in 1903.

"Q. December, 1903, you testified yesterday, wasn't it? A. I think that is the time we made the agreement.

"Q. The land was already in the assets of the bank at that time, wasn't it? A. I don't know in what manner the thing was carried at all. I had absolutely no knowledge.

"Q. The deed had already been executed by Cranston to the bank, hadn't it? A. It had.

"Q. Did you make any change of any kind in reference to the title at that time or do anything to indicate that such an agreement, had been entered into? I don't know of any thing.

"Q. You didn't sign any such agreement did you with the bank? A. I don't know of any agreement covering the question..

"Q: There were no entries made on the books at

that time. A. I don't know what entries may have been made on the books. I never had anything to do with the book keeping.

"Q. All there was to it was a private conversation between you and Mr. Smith? A. It was simply an agreement between us.

"Q. A verbal agreement, wasn't it? A. It was."

In addition to this Godding continued to treat the coal land thereafter as his own, and to the extent of entering into a personal contract for the development of the premises to the extent of $2,500.00, of which a part was paid thereon by him, and not by the bank.

The conclusion is therefor irresistible that there was no actual sale of the premises to the bank, but that it was conveyed upon the direction of Godding, to the bank in his language, as "a trustee," and as pretended security for the payment of the sums included in the advance to Cranston, the overdraft, and the more than four thousand dollars additional received by Godding at the time. Therefore under this view the overdraft created largely by the withdrawal of funds for the building of the house, was never in fact paid, or in any legitimate way discharged.

The allegation that the bank was not conducted as a corporation entity but rather as Godding's private affair, is well sustained.

The record discloses that the last directors meeting was held October 1st, 1892, or more than fifteen years prior to the failure.

Smith testified: "Mr. Godding dictated the policy of bank. I acquiesced in his proposition of settlement. If he had not been indebted to bank I would not have agreed to the proposition. Would have preferred cash

settlement. I think he was making the best settlement he could. Did not discuss settlement with other directors. Am not sure whether they knew about it. I think Mr. Godding had been incurring this indebtedness over a period of seven or eight years."

And again: "He proposed the settlement himself. I credited him with $16,000.00 in taking up the cash items. He was director and officer. There were practically but two stockholders, he and myself and whatever we agreed upon went. Senator Swink was a small stockholder, director and vice-president. Don't remember who were directors from 1896 to 1903. There were always five directors at times."

Smith also testified in relation to this matter as follows:

"Q. Now is it not a fact that this whole transaction of Mr. Godding's * * * was done and performed under his direction, and strictly according to his orders from day to day, from month to month, and from year to year, and that you made whatever entries in the books of the bank you were asked to make by Mr. Godding in reference thereto? A. I always looked upon Mr. Godding as my superior officer.

"Q. And when he directed you, or asked you to make any of these entries touching his transactions you made them, did you not? A. I did. Mr. Godding proposed the settlement himself and I made the entries or caused them to be made, on the books. He was acting as a director and officer of the bank."

From this and from the record generally it is clear that Smith was simply the creature and tool of Godding in the outrageous and criminal conduct of the bank, and at no time acted as an officer with independent thought and conduct.

The shameful conduct of the bank in the interest of Godding, and covering a period of many years prior to its failure, is shown by an extract from the testimony of F. J. Spencer, a certified public accountant, as follows:

"Exhibit Q copied into record. Warrants, stocks and bonds account contains two items affecting solvency, $20,000, December 31, 1903, and $25,000.00 June 21, 1904. The first is a debit to the account and credit to Godding's account. Entry don't show what other items consist of. National Bank of Chicago was charged $5,200.00 and cash items increased $4,290.14, total $34,420.14. Journal shows credit $32,664.08, Godding's account credited $1,-836.06. The W. S. and B. account was credited December 30, 1907, $45,000, surplus debited $30,000, undivided profits charged $15,000. Bank lost $45,000 in this account. Bankers' National item of resources, $40,129.34, began under caption Lincoln National Bank. December 30, 1893, State Bank charges Bankers' National $1,600 as collection. Collection was not sent. J. E. Godding got credit for it. June 30, 1894, Bankers' National charged $2,000.00 as remittance, which was not sent. January 3, 1898, Lincoln National charged with remittance $15,200.00 loans and discounts credited $14,800.00 by payment of Godding's notes and giving him $400.00, making $15,-200.00. Remittance was never made. The three entries are false. April 16, 1901, Godding drew $6,000.00 draft on Bankers' National, which was paid and no credit given Bankers' National. Godding got the benefit without this being charged. July 1, 1901, Godding's note was discounted with Bankers' National for $10,000.00 and placed to his credit. State bank failed to charge it to Godding, also interest $166.67 on same. June 21, 1904, Bankers' National charged $5,200.00 never sent them. In these six transactions J. E. Godding received benefit of $40,166.00 and state bank lost the money. The statement is false to extent of $40,000.00."

The court was justified in concluding from the evidence the following facts: (a) That at all times involved, John E. Godding, husband of Emma A. Godding, appellant, was in actual control and direction of the bank; (b) that it was continually conducted during such period in fraud of its depositors, to the financial benefit of Godding; (c) that the residence premises upon which the court impressed the lien, was at the commencement of the erection of the dwelling, the property of Emma A. Godding; (d) that at such time Godding was not indebted to his wife Emma A. Godding in any sum of money whatsoever; (e) that Godding fraudulently withdrew from the depositors money, the sum named in the court's decree, and that this is directly traced into the construction of the house upon the premises therein involved; (f) that at the time of such withdrawal Godding had no money to his credit in the bank, but on the contrary, was indebted to the bank in a large sum of money which he could not then reasonably expect to pay, and which he has not since paid; (g) that no part of said sum so withdrawn for the erection of the dwelling, has ever been paid, and was not intended to be repaid at the time; (h) that Emma A. Godding did not know at the time, of the financial condition of either Godding or the bank, or that the checks in payment were drawn or paid in the manner as now appears; (i) that John E. Godding personally had charge of the erection of the dwelling in question, and of all other business details, whether claimed to be his property or that of his wife, and conducted the same in every respect as his own; (j) that John E. Godding and Emma A. Godding, as husband and wife, occupied the dwelling as their home from the time of its completion until after the bank failure.

The question raised by the appellant, is as to the right of the court under the law, to impress a lien upon the residence premises for the sum of money so traced

to a use in the construction of the building.  It is true that counsel do not agree that the conclusions of fact above stated, are fairly deducible from the evidence, but we think otherwise.  But we do not deem it necessary to pass upon the court's holding upon this question, for we are of the opinion that under the pleadings and evidence the appellee, is in equity and justice, entitled to relief in a greater degree and extent than that adjudged by the court.

This question is raised by the assignment of cross error, and specifically upon the action of the court in sustaining the demurrer of the defendants to the second cause of action.  In other words, was the appellee entitled to recover under the trust deed of Emma A. Godging to Pollock.  This deed in so far as it is necessary to quote, recites:

"Whereas, the undersigned, Emma A. Godding, wife of John E. Godding, one of the officers of the State Bank of Rocky Ford, being desirous of doing all in her power to liquidate the indebtedness of said bank, and feeling confident that the assets thereof will pay off such indebtedness in full, and

"Whereas, the time and attention of the late officers of said bank is required to assist in the realization of such assets, and, it being the wish and desire of the undersigned that such officers shall not be hampered, or delayed by trivial or other persecutions or prosecutions, and therefore the conveyance hereinafter made is upon the condition that their time and attention be left for such assistance.

"And Whereas, it is thought necessary that at least two crop seasons intervene before the assets can be turned unto money, and the desire of the undersigned being to make the balance of the fund, if any, necessary to

pay off such depositors, and as two years seems to be about the proper time for the trust hereinafter created to become operative,

"And Whereas, the undersigned is the owner of the property hereinafter described, and anxious and willing to place the same in trust for the payment of such balance of indebtedness, if any, upon the condition above recited.

"Now, Therefore, this indenture, made this 17th day of January, A. D. 1908, between Emma A. Godding, of the county of Otero and state of Colorado, and Robert M. Pollock, trustee for the depositors of the State Bank of Rocky Ford, of the county of Otero and state of Colorado."

The consideration is stated to be one dollar and other valuable consideration, the premises to be held for a period of two years, and then sold and the proceeds distributed among the depositors of the bank according to the amount of their deposits, the remainder, if any, to be paid to the grantor. The deed was duly acknowledged and delivered to the trustee Pollock, accepted by him and filed for record with the county clerk and recorder, on the 18th day of January, 1908.

The contention of the plaintiff in error is that, assuming the condition of the deed to be in effect, that there should be no criminal prosecution of the officers of the bank, and particularly the husband, the deed is null and void as being contrary to public policy. This view was apparently accepted by the learned Judge who tried the case, and who in sustaining the demurrer, must have held the deed void on its face for such reason. This was error.

There is no contention that the deed was executed under duress, or that it was even at the suggestion of the

trustee or any other person, but on the contrary it clearly appears to be the voluntary act of the grantor, and indeed the trustee hesitated to accept it until he had first counseled with the receiver.

*Lomax v. Colo. Natl. Bank*, 46 Colo. 229, 104 Pac. 85, was a case where the doctrine invoked here was likewise involved and fully discussed. The plaintiff in that case sued for the recovery of sixty-five shares of the capital stock of the Flint-Lomax Electric and Manufacturing Company, which had been deposited as collateral security to secure her husband's note to the defendant bank, given under the following circumstances. Alfred Lomax, brother of plaintiff's husband, was an employe of the bank; he embezzled about $5,000 of the bank's money; he and his wife besought the president of the bank not to prosecute, and who said that he had no disposition to do so, but if the amount was not paid Alfred would be turned over to the bonding company, and in any event the offense would have to be reported to the bank examiners.

The brother of Alfred and husband of plaintiff, after several interviews with the officers of the bank, gave his note to the bank for the sum embezzled, secured by sixty-five shares of the stock of the manufacturing company. This stock was owned by the plaintiff, who permitted her husband to have the stock reissued in his name, for the purpose of using it as collateral security for what the husband represented to her to be a debt of the company, in which he was interested, and of which company he was an officer.

The ground of the suit was that plaintiff received no consideration for the stock; that her husband was under duress at the time, and that the only consideration for the note was the illegal promise of the bank not to prosecute the defaulter. The case turned upon this point and

it was held that if the husband's note was void because of duress or lack of consideration, the pledge of the stock was also void, and the plaintiff entitled to its return.

The plaintiff's husband testified that the note and pledge were given upon the sole and only consideration of the bank's promise made to him, not to prosecute his brother. On the other hand the president and vice-president flatly denied that any such promise was given. The trial court found for the bank upon this disputed question of fact.

It will be noticed that while the court found in that case that there was no actual promise, yet both the bank and the maker of the note had the clear understanding, that if the amount of the defalcation was not paid, there was reasonable certainty of the prosecution of the defaulter. Indeed Mr. Justice Campbell, the writer of the opinion, in speaking of the motives that actuated the plaintiff, said:

"Undoubtedly he was in mental distress and worried by the criminal act of his brother and wished to avoid the humiliation which publicity would bring to the family; but if his testimony tends to show that he gave his note to the bank because of a fear that if he did not his brother would be, and if he did his brother would not be, prosecuted and that threats of a prosecution by the bank's officers overcame his will, their testimony is directly contrary to his. Again, while Fred's object may have been, in part, to avoid the disgrace of a criminal prosecution, the court, on substantial evidence, found that he was not under duress. As an intelligent business man, probably he believed that if he did not discharge Alfred's civil liability for his embezzlement, Alfred would be turned over to the bonding company, and the latter would, if required to pay, institute criminal proceedings. And rather than face such reasonable certainty he chose

to wipe out the obligation with his own secured note and take chances of a prosecution by the government officials when the crime was reported to the bank examiner along with notice of payment of the shortage."

The law upon the subject of such promise was there briefly stated to be as follows:

"It is well understood law that a promise to compound any criminal offense is itself a crime and affords no valid consideration for a contract. Our statute upon this subject, 1 Mills' Ann. Stats., sec. 1293, while so providing, says: 'but no person shall be debarred from taking his goods or property from the thief or felon or receiving compensation for the private injury occasioned by the commission of any such criminal offense.' In *Giles v. DeCow,* 30 Colo. 412 [70 Pac. 681], it was said, 'A thief is under a legal, as well as a moral, duty to repay the person whose property he has stolen, and it is not in itself an illegal contract for him to give his own obligation therefor, or for a third party to agree to recompense the owner for the loss.' If, therefore, the consideration for Fred's note, in whole or in part, was an agreement by the bank not to prosecute, the note cannot be enforced, and the bank cannot retain the pledge; but if the note was given by Fred and received by the bank as compensation for the bank's private injury, in discharge of Alfred's civil liability, the note is enforcible and the pledge valid."

Upon the question of consideration in such a case it was also said:

"Plaintiff cites the case of *Currier v. Clark,* 15 Colo. App. 6 (60 Pac. 958), as decisive of this. We do not perceive its pertinency to the facts of this case as found by the trial court. There it was held that a note to pay the debt of another, not executed at the time of the original

debt, must be based upon some new and valid consideration. Assuming that to be the law, it is inapplicable here, because, as we have already determined, Fred's note was given in payment and discharge of Alfred's pre-existing liability, and by the established law of this state this is a sufficient consideration—*Bank v. McClelland*, 9 Colo. 608 [13 Pac. 723]; *McMurtrie v. Riddell*, 9 Colo. 497 [13 Pac. 181]; *Knox et al. v. McFarran*, 4 Colo. 586; *Murphy, Receiver, etc., v. Gumaer*, 12 Colo. App. 472 [55 Pac. 951]."

That case seems controlling in the case at bar. Under this authority the consideration in the deed of Mrs. Godding to Pollock, trustee for the depositors, was sufficient. Godding was the principal owner of the bank; he absolutely controlled it and he alone was responsible for its failure, and the consequent loss to the depositors. There was the relationship of wife and husband. There was naturally equal anxiety to relieve her husband from impending punishment, and the consequent disgrace both to herself and to him, by doing what she could to satisfy the debts of those whom he had so unjustly deprived of their property. All the property she held in her name, and included in the deed, she had received from him, and at best as a gift, however it may have been acquired.

We cannot presume that she was not actuated through conscience as well as fear, when she declared in the deed that; "Whereas, the undersigned, Emma A. Godding, wife of John E. Godding, one of the officers of the State Bank of Rocky Ford, being desirous of doing all in her power to liquidate the indebtedness of said bank"; and again when she recited her express desire that; "Whereas, the undersigned is the owner of the property hereinafter described, and anxious and willing to place the same in trust for the payment of such balance of indebtedness."

From these expressions and with knowledge of the

facts which she must have then possessed, certainly her inducement and consideration was not less than is disclosed in the *Lomax* case.

It is clear that neither Pollock nor any one of the depositors verbally agreed to refrain from prosecution or to promise freedom from punishment, and we cannot so construe the deed. It is true that in the deed is expressed the opinion that the "assistance of the officers is required to assist in a realization of the assets;" and likewise her wish that they "shall not be hampered by trivial or other persecutions or prosecutions," but the condition upon which plaintiff in error relies is "that their time and attention be left for such assistance."

This does not express an agreement to compound a crime. Hence we conclude that neither orally nor by the language of the instrument itself, is there an agreement that plaintiff's husband should not be prosecuted for the commission of a crime. Indeed, such an agreement seems to have been expressly avoided in the deed, just as in the *Lomax* case, where the president of the bank testified that he knew the law in such case, and refrained from making such an agreement.

But if we were to give to the alleged condition the construction contended for by the appellant, still under the authorities, we must hold the conveyance to be in full force and effect. There can be no question but that the condition relied on in this case was not a condition precedent, but subsequent, so that we are relieved from discussion upon that point.

The deed was absolute, although the trustee was not under its terms, to execute the trust until two years from its date. This was to give sufficient time to realize upon the assets of the bank, whatever these might be, and thereafter the property was to be sold by the trustee to meet the deficiency.

The trust was clearly and definitely expressed and without power of revocation. Any assistance to be rendered by the officers of the bank was of necessity to be subsequent to the execution and delivery of the deed.

It will be noted that this question of assistance referred to as a condition, is of very uncertain meaning. Who was to be assisted? What was the time or duration of the period of such assistance. The nature or character of such assistance, or whether it was to consist of acts, advice or what not, is all left to conjecture. The only certainty is that these officers were not to be in charge or control, or to assume responsibility, for the bank was at the time in the custody of the court's receiver, and therefore known by the parties to be beyond the power of the parties to contract.

The rule of law as to whether a condition is precedent or subsequent, is stated to be:

"If the act or condition required does not necessarily precede the vesting of the estate, but may accompany or follow it, and if the act may as well be done after as before the vesting of the estate, or if from the nature of the act to be performed, and the time required for its performance, it is evidently the intention of the parties that the estate shall vest, and the grantee performs the act after taking possession then the condition is subsequent. Again, a condition, the breach of which is good ground in equity for cancelling the conveyance of which it is a part, will be held to be a condition subsequent, unless there is something in the instrument showing a contrary intent. 13 Cyc. 691."

That where an estate is once vested with a condition subsequent, as in this case, courts will look upon the divesting of the same with disfavor, was held in the case of *Chute v. Washburn*, 44 Min. 312, 46 N. W. 555, where the court said;

"It is hardly necessary to add that conditions subsequent are not favored by the law, and are construed strictly because they tend to destroy estates, and that a vigorous exaction of them is a species of *summum jus,* and in many cases hardly reconcilable; and courts of equity will never lend their aid to divest an estate on the breach of a condition subsequent."

And where the condition is illegal, indefinite or uncertain, unreasonable or repugnant to the nature of the estate to which it is annexed, such condition is void, and renders the grantee's estate absolute, is stated to be the rule.  6 Am. and Eng. Enc. 506.

In *Compton v. Bunkerhill Bank,* 96 Ill. 301, 36 Am. Rep. 147, the plaintiff's husband as cashier of the bank, was a defaulter in a large sum. The husband and a brother induced her to execute a deed for her property to the bank, on their representation that if she would do so the bank had agreed not to prosecute the husband. The action was based upon the alleged illegal agreement not to prosecute. It was there held:

"The gist of appellant's case is that her deed was executed in consideration of an agreement to compound a criminal offense, which is in contravention of law, and she has not realized therefrom the result that she anticipated. We said in *St. L. J. & C. R. R. Co. v. Mathers,* 71 Ill. 598: 'A court of equity will not lend its aid to enforce the performance of a contract which appears to have been entered into by both the contracting parties for the express purpose of doing that which is illegal; and where such a contract has been executed by one of the parties by conveying real estate, a court of equity will not, in general, interfere, but will leave the title to the property where the parties have placed it.' This is but the repetition of an old and well established principle of equity jurisprudence, and it was previously applied by

this court in *Jerome v. Biglow,* 66 Ill. 452, 16 Am. Rep.
597, and *Liness v. Hesing,* 44 *id.* 113 [92 Am. Dec. 153]."

And in the opinion in that case it was further said:

"Even then, if appellant was induced by false repre-
sentations of her husband and brother to execute the
deed, since those representations were neither induced by
nor made with the knowledge of those representing the
bank, the bank cannot be affected by them. *Spurgin v.
Traub et al.,* 65 Ill. 170; *Marston v. Brittenham,* 76 *id.*
611."

. It may be and probably is true that Mrs. Godding
executed the trust deed in the hope and expectation that
by so doing she would avoid the prosecution of her hus-
band, but there was no such assurance or agreement upon
the part of Pollock or the depositors for whom he held in
trust.

In *Treadwell v. Torbert,* 119 Ala. 279, 24 So. 54, 72
Am. St. 918, the plaintiff executed her deed to premises
owned by her to one Torbert who had caused the arrest
of the husband, and who promised to stop the criminal
prosecution in consideration of the deed. The suit was
instituted to cancel the deed and the supreme court held:

"The general doctrine prevailing in courts of law
and of equity is that the law leaves all who share in the
guilt of an illegal or immoral transaction where it finds
them. It will neither lend its aid to enforce contracts,
while executory, forming part of the transaction; nor
will it undo or rescind such contracts when executed. 3
Brick Dig., pp. 144-147. The case made by the bill falls
within this doctrine, and is in all respects strictly analog-
ous to *Clark v. Colbert,* 67 Ala. 92. It may be a matter of
regret now, with the complainant, that she parted with
her land to procure the discharge of her husband from
prosecution for the grave criminal charge preferred

against him, and for which he was under arrest. The courts are bound to leave her where they find her. As was said in a kindred case: 'If men, in consummation of frauds, employ instruments binding and conclusive in their legal operation and effect, it is sound reason, good policy, sheer justice, to leave them where they have placed themselves, bound as they have bound themselves, without assistance from the courts to unloose them when it becomes their interest to be unloosed, encouraging them and others to commit similar frauds.' *William v. Higgins,* 69 Ala. 517.''

The doctrine thus declared is supported by *Moore v. Adams,* 8 Ohio 372, 32 Am. Dec. 723; *Shattuck v. Watson,* 53 Ark. 147, 13 S. W. 516, 7 L. R. A. 551; *Allison v. Hess,* 28 Iowa 389; *Rock v. Mathews,* 35 W. Va. 531, 14 S. E. 137, 14 L. R. A. 508.

The judgment is reversed with instructions to overrule the demurrer to the second cause of action, to permit the plaintiff to amend his complaint as he may be advised, and to proceed with the cause in conformity with the views herein expressed.

In department.

MUSSER, C. J., and GABBERT, J., concurring.